AUBURN POLICE UNION, et al., Plaintiffs, Appellants,

v.

Michael E. CARPENTER, Attorney General of the State of Maine, Defendant, Appellee.

AUBURN POLICE UNION, et al., Plaintiffs, Appellees,

v.

Michael CARPENTER, Attorney General of the State of Maine, Defendant, Appellant.

Nos. 92–1951, 92–2028.

United States Court of Appeals, First Circuit.

Heard Jan. 5, 1993.

Decided Nov. 12, 1993.

Errol Copilevitz with whom John P. Jennings, Jr., Copilevitz, Bryant, Gray & Jennings, P.C., Leland N. Chisholm and Kelly, Remmel & Zimmerman, were on brief, for plaintiffs.

MacKenzie Canter, III, Leonard J. Henzke, Jr., Lehrfeld, Canter, Henzke & Diskin and George Gills, on brief, for Maine State Troopers Ass'n, Nat. Ass'n of Police Officers, Nat. Troopers Coalition and Texas State Troopers Ass'n, amici curiae.

Stephen L. Wessler, Deputy Atty. Gen., with whom Michael E. Carpenter, Atty. Gen., and Thomas D. Warren, Deputy Atty. Gen., were on brief, for defendant.

Before CYR, Circuit Judge, CAMPBELL, Senior Circuit Judge, and BOUDIN, Circuit Judge.

LEVIN H. CAMPBELL, Senior Circuit Judge.

The State of Maine has enacted a law (hereinafter "the Act") prohibiting a person from soliciting property from the general public that tangibly benefits any law enforcement officer, agency or association.[1] Violations of the Act are declared to contravene the Maine Unfair Trade Practices Act, and they may be enjoined and penalized civilly. Me.Rev.Stat.Ann. tit. 5, § 209 (West 1992).

Plaintiffs comprise a coalition of police unions, individual law enforcement officers, a professional fundraiser and a private citizen.[2] They sued in the United States District Court for the District of Maine pursuant to 42 U.S.C. § 1983, seeking to enjoin the Act and to have it declared unconstitutional under the First and Fourteenth Amendments to the United States Constitution.

While declaring that the provision for injunctive enforcement was an unconstitutional prior restraint, the district court otherwise upheld the Act against plaintiffs' overbreadth and equal protection challenges. Both the State of Maine and plaintiffs appeal. We vacate the district court's determination that the injunctive relief provision amounts to an impermissible prior restraint, and affirm the district court's upholding of the constitutionality of the Act.

## I.

As the Act was originally enacted in 1977, its sole exception was for solicitations by or on behalf of law enforcement officers campaigning for election to public office—an exception still in existence. Me.Rev.Stat.Ann. tit. 25, § 3703. In 1983, the Act was amended to allow game wardens to sell historical publications describing state parks.[3] Me. Rev.Stat.Ann. tit. 25, § 3702.

In 1983, Maine's Attorney General brought an action under the Unfair Trade Practices Act, Me.Rev.Stat.Ann. tit. 5, §§ 205-A to

---

1. Entitled the "Solicitation by Law Enforcement Officers Act," the statute provides that:

 A person may not solicit property from the general public when the property or any part of that property in any way tangibly benefits, is intended to tangibly benefit or is represented to be for the tangible benefit of any law enforcement officer, law enforcement agency or law enforcement association.

 Me.Rev.Stat.Ann. tit. 25, § 3702-A (1992).

2. Plaintiffs include the Auburn Police Union, the Portland Police Benevolent Association, and the Lewiston Police Union—all of which come within the definition of a "law enforcement association" as defined in Me.Rev.Stat.Ann. tit. 25, § 3701(2); Leonard Dexter, Kevin MacDonald, and David B. Chamberlain—all of whom are officers of law enforcement associations; R.H. McKnight Co., Inc., a corporation in the business of fundraising and promotions on behalf of law enforcement officers, agencies, and associations through sale of advertising and publication of trade magazines, programs and handbooks; and Charles Underwood, a private citizen who wishes to advertise in police publications and to receive copies of those publications.

3. After the 1983 amendment, section 3702 provided the following:

 No person may solicit property from the general public when the property, or any part of it, in any way benefits, is intended to benefit or is represented to be for the benefit of any law enforcement officer, law enforcement agency or law enforcement association, except that any state warden service association may offer for sale, by persons other than wardens or members of the association, to members of the public guide books or handbooks containing historical reviews or descriptions of services, except that on the request of a nonmember the association may provide that person with the copies requested for sale by that person. No advertisements may be sold or included in these publications, except greetings or complimentary statements from members or former members which shall give the full name of the member or former member. A stated rate for this advertisement space shall be published and no funds in excess of that stated rate may be accepted by the association for space.

 A record of receipts and sales for space and sales of the publication shall be kept and available to the public during normal working hours.

 All proceeds from these sales shall be expended for direct charitable services to members or their spouses, widows, children, widowers or parents and may not be used for buildings or equipment, construction or maintenance or entertainment of members.

 Any violation of this chapter shall constitute a violation of Title 5, chapter 10, the unfair trade practices laws.

 Me.Rev.Stat. tit. 25, § 3702.

214, against the Maine State Troopers Association ("M.S.T.A.")—a law enforcement association as defined in Me.Rev.Stat.Ann. tit. 25, § 3701(2)—to enjoin the M.S.T.A. from engaging in solicitations in violation of § 3702. The Attorney General alleged that the M.S.T.A. had sold and offered to sell advertisements to Maine businesses for insertion in its magazine, "The Maine State Trooper." The M.S.T.A. challenged the Act's constitutionality, and the case went to the Maine Supreme Judicial Court (the "Law Court"), which in 1985 upheld the Act as constitutional. *See State v. Maine State Troopers Ass'n ("MSTA"),* 491 A.2d 538 (Me.), *appeal dismissed,* 474 U.S. 802, 106 S.Ct. 34, 88 L.Ed.2d 28 (1985).

The Law Court found that Maine had a compelling interest in avoiding police coercion. It found irrelevant the subjective intent of the solicitor and the absence of any complaint of coercion: "... at least the appearance of coercion inheres in every solicitation on behalf of law enforcement," undermining "the integrity of the office." *Id.* at 542–43. The Law Court noted the Maine Legislature's finding that "[s]olicitation by a law enforcement agency is inherently coercive." *Id.* In the court's view, the State's interest "in protecting the reputation of its law enforcement bodies is undeniably substantial. Indeed, we would be hard pressed to suggest a weightier interest." *Id.* Holding the statute not to be "fatally overbroad," the Law Court emphasized that "the integrity of the State's law enforcement agents is cast in doubt with every solicitation on their behalf." *Id.* Thus the court found the Act constitutional.

The Law Court, however, affirmed the lower court's decision that under the Equal Protection Clause of the Fourteenth Amendment, the State could not impose any greater restrictions on the solicitation activities of other law enforcement officers than were imposed upon state wardens. *Id.* at 544.[4] The Maine State Troopers Association ap-

pealed from the Law Court's decision to the Supreme Court of the United States, which summarily dismissed the appeal for want of a substantial federal question. *Maine State Troopers Ass'n v. Maine,* 474 U.S. 802, 106 S.Ct. 34, 88 L.Ed.2d 28 (1985).

In 1989, following the Supreme Court's summary dismissal of the appeal in *MSTA,* the Maine Legislature amended the Act so as to permit the Department of the Attorney General to charge for the cost of consumer education materials. Me.Rev.Stat. tit. 25, § 3706. The Legislature additionally amended the Act to permit solicitations for a period of one year, later extended an additional six months, to raise funds for the construction of a memorial to slain police officers. Priv. & Spec. Laws 1989, Ch. 47; Priv. & Spec. Laws 1990, Ch. 114.

In 1990, the same plaintiffs who brought the present suit challenged the constitutionality of the Act in the federal district court. *See Auburn Police Union v. Tierney ("Auburn I"),* 756 F.Supp. 610 (D.Me.1991). The district court affirmed the magistrate judge, who ruled in a comprehensive opinion that the Supreme Court's summary dismissal of *MSTA* was not a binding precedent because the Legislature's enactment of the above exceptions had undermined *MSTA's* premise that all solicitation by law enforcement officers and organizations is inherently coercive. *Id.* at 616.[5] The court held that the Act was unconstitutionally overbroad and invalid on its face because "[a] complete prohibition on police solicitation is not narrowly tailored to Maine's evident interest in banning some, but not all, such solicitation." *Id.* at 618. The court further concluded that the Act violated the Equal Protection Clause of the Fourteenth Amendment because the State could not demonstrate a substantial governmental interest in permitting police solicitation for a memorial to slain officers, while prohibiting police solicitation for other causes. *Id.* at 619. Finally, the district court determined

---

4. The Law Court affirmed the lower court's judgment that the M.S.T.A. should be permitted to sell their publications to the general public, subject to the same restrictions imposed on associations of state wardens by Me.Rev.Stat.Ann. tit. 25, § 3702.

5. The magistrate judge rejected arguments that *MSTA* and the case before him turned on "very different" facts and that post-*MSTA* developments undermined *MSTA's* precedential value.

that the Act constituted an impermissible prior restraint because it "silences by fiat an entire category of charitable solicitation." *Id.* at 618. The State of Maine did not appeal in that case.

Instead, in 1991, the Maine Legislature repealed the exemptions, except for the exemption for solicitations by or on behalf of law enforcement officers running for public office.[6] The Legislature then reenacted the prohibition on solicitations with one material change—the Legislature added the word "tangibly" prior to the word "benefits" in the new § 3702–A so as to "clarif[y] that the ban on solicitations applies only when the solicitations provide a tangible benefit to law enforcement." Sen. Amend. B to L.D. 1682 (115th Legis.1991).

In October 1991, the Department of the Attorney General proposed rules under the Unfair Trade Practices Act, Me.Rev.Stat. Ann. tit. 5, § 207, defining the word "tangibly" as used in § 3702–A.[7] Me. Dep't of Att'y Gen. 26–239 (1991). These rules provide that "a solicitation which is completely unrelated to law enforcement officers, although it increases good will toward law

enforcement, does not confer a tangible benefit," whereas "[a] solicitation which funds a law enforcement program, which otherwise would have to be funded through law enforcement's own budgeting processes, does confer a tangible benefit." *Id.*[8]

Plaintiffs brought the present suit on September 27, 1991, seeking a declaratory judgment that § 3702–A is both facially unconstitutional and unconstitutional as applied. Preliminary and permanent injunctions against enforcement of § 3702–A were requested. Several plaintiffs alleged that they wanted to solicit advertising from the business community and to place those advertisements in police magazines like the "Maine State Trooper," and that the Act prohibited this conduct. According to plaintiffs, § 3702–A violates the First and Fourteenth Amendments because it is unconstitutionally overbroad, serves as an impermissible prior restraint on their freedom of speech, and denies to them the equal protection of the laws.

The district court held that the provision for enforcement of the Act through injunctive

---

**6.** In addition to repealing the exception allowing the Department of the Attorney General to charge for the cost of consumer education materials, Me.Rev.Stat.Ann. tit. 25, § 3706, the Legislature repealed the exception permitting State Warden Service associations to sell guide books but not advertisements, Me.Rev.Stat.Ann. tit. 25, § 3702, and an exception permitting non-law enforcement officers to sell advertising in publications of the Department of Inland Fisheries and Wildlife, Me.Rev.Stat.Ann. tit. 25, § 3705. The Private and Special Laws permitting solicitations to raise funds for the construction of a memorial to slain police officers expired by their own terms. Priv. & Spec.Laws 1989, Ch. 47; Priv. & Spec.Laws 1990, Ch. 114.

**7.** The Attorney General has rulemaking authority under the Unfair Trade Practices Act. Me.Rev. Stat.Ann. tit. 5, § 207(2).

**8.** The "Rules Concerning Unfair Trade Practices and Charitable Solicitations by Law Enforcement Officers" provide the following:

109.1 SOLICITATIONS THAT TANGIBLY BENEFIT LAW ENFORCEMENT

A solicitation tangibly benefits a law enforcement agency, officer, or association if the proceeds of that solicitation are used, represented to be used, or intended to be used to support a law enforcement program or purpose which a law enforcement agency or association other-

wise would have to fund through its own budgeting mechanism. Examples of solicitations which tangibly benefit law enforcement are as follows: (1) A solicitation which raises money from community members to pay for the purchase of equipment for a local police department; (2) A solicitation to send an officer into school classrooms to conduct anti-drug abuse training (the money paying for the officer's salary and for education materials); and (3) The solicitation of funds for erection of a monument to memorialize slain officers, which was permitted by prior law, Priv. & Spec.Laws 1989, ch. 47.

109.2 SOLICITATIONS THAT DO NOT TANGIBLY BENEFIT LAW ENFORCEMENT

A solicitation of money for purposes completely unrelated to law enforcement, such as for a charity unrelated to law enforcement, does not confer a tangible benefit on law enforcement even if the solicitation effort increases good will toward law enforcement. For example, if police officers engage in solicitations of money for earthquake victims in South America, and if no law enforcement agency, officer, or association receives, is intended to receive, or is represented to receive any of the proceeds of the solicitation, then that solicitation program will *not* tangibly benefit law enforcement. Me. Dep't of Att'y Gen. ch. 109.

relief created an impermissible prior restraint. Otherwise, it upheld the constitutionality of § 3702–A. *See Auburn Police Union v. Carpenter* ("Auburn II"), 798 F.Supp. 819 (D.Me.1992). Plaintiffs appeal, arguing that the Act is unconstitutionally overinclusive and underinclusive. Maine argues in response that the United States Supreme Court's summary dismissal of the appeal in *MSTA* must be accorded binding precedential effect on the issues of overbreadth and underinclusiveness. Even if the Supreme Court's summary dismissal does not control, Maine argues that the Act must still be upheld because it is narrowly tailored to serve a compelling interest. Maine also appeals from the district court's declaration that the injunctive relief provision constitutes an impermissible prior restraint.

## II.

This appeal presents difficult questions. We must decide, first, what issues are foreclosed by the Supreme Court's dismissal for want of a federal question of the appeal in *MSTA*. And, if any of the First and Fourteenth Amendment issues raised by appellants are not foreclosed by *MSTA,* we must decide them.

In the enabling Act, the Maine Legislature said that the Act:

> clarifies and reaffirms that the primary and compelling purpose underlying the laws governing solicitation by law enforcement officers is to eliminate the coercion that is inherent in solicitations by and on behalf of law enforcement officers by prohibiting such solicitations. When a law enforcement officer solicits from a prospective donor, the donor may not feel totally free to reject the request in light of the officer's position....

Priv. & Spec. Laws 1991, Ch. 510, § 5. We set forth in an appendix the full text of this section of the enabling Act.

In challenging the Act, appellants contend it goes far beyond what is constitutionally permissible and necessary to address whatever valid concerns exist about the coerciveness of police solicitations. Appellants insist that such dangers, if any, must be regulated

more narrowly, for example, by legislation prohibiting solicitation by officers in uniform, or requiring that solicitation be done only by persons who are not themselves police officers. The present total ban on solicitation by any "person" when the property or any part of it "in any way tangibly benefits, is intended to tangibly benefit or is represented to be for the tangible benefit of any law enforcement officer ... agency or ... association," is said to be unconstitutionally broad, foreclosing innocent actions and speech that could not possibly cause any of the evils the Maine Legislature fears. For example, the Act would bar placing an unattended collection box for a police charity in a public place, even though doing this could not, appellants say, exert a coercive influence. Appellants say that the Act does not adopt, as the First Amendment requires, the least restrictive means to address the evil of police coercion; that it is a prior restraint, not only because of the conferred injunctive powers but because of its overall scheme; and that it offends other constitutional principles.

These issues are not easy given the protection our Constitution affords speech and speech-related activities. . Nonetheless, we conclude that the Maine Legislature's effort to deal with the dangers of police solicitation is within its constitutional authority. We hold that the Supreme Court's dismissal of the *MSTA* appeal is binding on the overbreadth issue, and that appellants' remaining constitutional claims are insufficient.

### A. *Standard of Review*

■ This case was submitted below on a stipulated record and upon cross-motions for summary judgment. In such a case, we review the district court's determinations *de novo. Brewer v. Madigan,* 945 F.2d 449, 452 (1st Cir.1991); *New England Legal Found. v. Massachusetts Port Auth.,* 883 F.2d 157, 167 (1st Cir.1989).

■ The standard for reviewing appellants' First Amendment claims depends upon whether the Act's effects on speech are content-based. Content-based regulations are subject to strict judicial scrutiny; they are "presumptively invalid." *R.A.V. v. St. Paul,* — U.S. ——, ——, 112 S.Ct. 2538, 2542, 120

L.Ed.2d 305 (1992); *Simon & Schuster, Inc. v. Members of New York State Crime Victims Bd.,* — U.S. —, —, 112 S.Ct. 501, 508, 116 L.Ed.2d 476 (1991) ("the Government's ability to impose content-based burdens on speech raises the specter that the Government may effectively drive certain ideas or viewpoints from the marketplace. [citation omitted] The First Amendment presumptively places this sort of discrimination beyond the power of the Government.").

The district court regarded the Act's restrictions as content-based, being limited to solicitations of property that tangibly benefits law enforcement officers and groups, and not extending to other sorts of solicitations. *See Burson v. Freeman,* — U.S. —, — – —, 112 S.Ct. 1846, 1850–51, 119 L.Ed.2d 5 (1992) (plurality opinion) (statute prohibiting solicitation of votes, but allowing other forms of solicitation within one hundred feet of poll is content-based); *cf. Heffron v. International Soc'y for Krishna Consciousness, Inc.,* 452 U.S. 640, 648–49, 101 S.Ct. 2559, 2564–65, 69 L.Ed.2d 298 (1981) (rule that no person or organization, whether commercial or charitable, may solicit except from a rented booth is content-neutral restriction as it "applies evenhandedly to all who wish to distribute and sell written materials or to solicit funds").

■ Maine denies that the Act is content-based, arguing that § 3702–A prohibits only the *act* of soliciting for something that tangibly benefits law enforcement. According to the State, the content of the solicitation—i.e., whether the message is that funds are need-ed for more equipment, to advocate strengthening the drug laws, or to promote capital punishment legislation—is not relevant to § 3702–A's ban on solicitation.

But while the Act may not regulate the details of a given solicitation, the fact remains that it applies to, and prohibits, only certain types of solicitation, necessitating an examination of the content of each solicitation in order to determine whether the Act's criteria are implicated. The Supreme Court has pointed to "the reality that solicitation is characteristically intertwined with informative and perhaps persuasive speech seeking support for particular causes or for particular views on economic, political, or social issues, and for the reality that without solicitation the flow of such information and advocacy would likely cease." *Schaumburg v. Citizens for Better Env't,* 444 U.S. 620, 632, 100 S.Ct. 826, 834, 63 L.Ed.2d 73 (1979). Like the court below, we conclude that the Act falls on the side of content-based regulation. As such, it is subject to "exacting First Amendment scrutiny." [9] *Riley v. National Fed'n of the Blind, Inc.,* 487 U.S. 781, 788, 108 S.Ct. 2667, 2673, 101 L.Ed.2d 669 (1988).

### B. *Overbreadth—Binding Precedential Effect of MSTA*

■ We move to Maine's argument that the summary dismissal of the appeal in *MSTA* by the Supreme Court of the United States is entitled to binding precedential effect on the issues of overbreadth and underinclusiveness.[10]

9. Perhaps it might be argued—although Maine has not done so—that the Act is content-neutral because it seeks to prevent only, the harmful "secondary effects" of solicitation, i.e., the implied coercion inherent in solicitation on behalf of law enforcement personnel, with the resulting loss of integrity. Restrictions based on the content of speech that seek to regulate only the "secondary effects" of the speech have, in certain situations, been deemed content-neutral because they "serve purposes unrelated to the content of the expression." *Ward v. Rock Against Racism,* 491 U.S. 781, 791, 109 S.Ct. 2746, 2754, 105 L.Ed.2d 661 (1989); *see Renton v. Playtime Theatres, Inc.,* 475 U.S. 41, 47, 106 S.Ct. 925, 928, 89 L.Ed.2d 29 (1986), *reh'g denied,* 475 U.S. 1132, 106 S.Ct. 1663, 90 L.Ed.2d 205 (1986). But even if this argument had not been waived, it is doubtful that these cases, involving very dis-similar facts and regulatory schemes, would apply here. *Cf. R.A.V.,* — U.S. at —, 112 S.Ct. at 2549 (listeners' reactions to speech are not "secondary effects"). In any event, we need not enter into the thicket of the "secondary effects" doctrine, as we conclude, *infra,* that, to the extent not controlled by the Supreme Court's summary dismissal of the *MSTA* appeal, the Act survives the stringent scrutiny applicable to content-based regulation.

10. We find no merit in plaintiffs' contention that *Auburn I,* 756 F.Supp. 610, is stare decisis. This court is not bound by a district court opinion that was never appealed to, or affirmed in, this court. *See* 1B Moore's Federal Practice 0.402[2], p. I–23 (1993) ("the doctrine of stare decisis makes a decision on a point of law in one case a binding precedent in future cases *in the same*

■ The Supreme Court's summary disposition of an appeal to it is an adjudication on the merits that must be followed by lower courts, subject, of course, to any later developments that alter or erode its authority. *Hicks v. Miranda,* 422 U.S. 332, 343–45, 95 S.Ct. 2281, 2289–90, 45 L.Ed.2d 223 (1975). We need, therefore, to determine the "reach and content" of the Supreme Court's dismissal of the appeal in *MSTA* for want of a substantial federal question. *See id.* at 345 n. 14, 95 S.Ct. at 2290 n. 14.[11]

■ In *Mandel v. Bradley,* 432 U.S. 173, 97 S.Ct. 2238, 53 L.Ed.2d 199 (1977), the Supreme Court said that, "[s]ummary affirmances and dismissals for want of a substantial federal question without doubt reject the specific challenges presented in the statement of jurisdiction and do leave undisturbed the judgment appealed from. They do prevent lower courts from coming to opposite conclusions on the precise issues presented and necessarily decided by those actions." *Id.* at 176, 97 S.Ct. at 2240; *see Illinois State Bd. of Elections v. Socialist Workers Party,* 440 U.S. 173, 183, 99 S.Ct. 983, 989, 59 L.Ed.2d 230 (1979) ("Questions which 'merely lurk in the record,' are not resolved, and no resolution of them may be inferred.") (quoting *Webster v. Fall,* 266 U.S. 507, 511, 45 S.Ct. 148, 149, 69 L.Ed. 411 (1925)). The Supreme Court's summary disposition will not control later lower court cases involving significantly dissimilar facts. *See Mandel,* 432 U.S. at 177, 97 S.Ct. at 2241 (vacating

lower court decision that summary affirmance was binding because facts in summary affirmance were "very different" from those before lower court). The Supreme Court further cautioned that summary dispositions "should not be understood as breaking new ground but as applying principles established by prior decisions to the particular facts involved." *Id.* at 176, 97 S.Ct. at 2240.

■ In ascertaining the "reach and content" of the Court's summary dismissal in *MSTA,* we may not rely solely upon the reasoning of the Maine Law Court. *Id.* ("Because a summary affirmance is an affirmance of the judgment only, the rationale of the affirmance may not be gleaned solely from the opinion below."); *accord Anderson v. Celebrezze,* 460 U.S. 780, 785 n. 5, 103 S.Ct. 1564, 1568 n. 5, 75 L.Ed.2d 547 (1983); *Fusari,* 419 U.S. at 391–92, 95 S.Ct. at 540–41 (Burger, C.J., concurring). Instead, we should examine the jurisdictional statement filed in the Supreme Court of the United States and any other relevant aid to construction in order to ascertain what issues were "presented and necessarily decided" by the Court's summary dismissal.[12]

■ Examining the *MSTA* jurisdictional statement, together with the accompanying papers filed with the Supreme Court and the opinions of the lower courts, we conclude that appellants in *MSTA* specifically presented the issue of facial overbreadth, including whether the Act was broader than justified by the underlying state interest, to the Su-

*court, and such courts as owe obedience to the decision.")* (emphasis added).

11. Both courts and commentators have noted the difficulty of ascertaining the proper reach of a Supreme Court summary disposition. *See Hicks,* 422 U.S. at 345 n. 14, 95 S.Ct. at 2290 n. 14 ("[a]scertaining the reach and content of summary actions may itself present issues of real substance"); *Fusari v. Steinberg,* 419 U.S. 379, 391, 95 S.Ct. 533, 540, 42 L.Ed.2d 521 (1975) (Burger, C.J., concurring) ("Another common response to summary affirmances ... is confusion as to what they actually do mean."), *reh'g denied,* 420 U.S. 955, 95 S.Ct. 1340, 43 L.Ed.2d 433 (1975); *Preston v. Seay,* 684 F.2d 172, 173 (1st Cir.1982) ("It is of course often difficult to understand the proper reach of Supreme Court summary affirmances and dismissals for want of a substantial federal question"); Note, "The Precedential Effect of Summary Affirmances and

Dismissals for Want of a Substantial Federal Question by the Supreme Court After *Hicks v. Miranda* and *Mandel v. Bradley,*" 64 Va.L.Rev. 117, 130 (1978) (noting "the difficulty inherent in any attempt to interpret a disposition without an opinion").

12. Besides contesting whether the current case presents the same issues that were involved in *MSTA,* plaintiffs contend that the facts in the instant case and *MSTA* are very different; that *MSTA* deviated from established constitutional principles and broke new ground; and that doctrinal developments have undercut the precedential value of *MSTA.* Like the district court in *Auburn I,* we find these three contentions lack merit. 756 F.Supp. at 614. Unlike the court in *Auburn I,* however, we also conclude that *MSTA* is entitled to binding precedential value on the issue of substantial overbreadth.

preme Court. We think the Court was obliged to have considered and to have rejected this issue as a predicate to its dismissing of the appeal for want of a substantial federal question. The issue of so-called underinclusiveness, however, does not so clearly appear in the papers, and later changes in the Act further erode the present bearing of *MSTA* on that topic. Therefore, the dismissal in *MSTA* is binding upon us as to overbreadth, but is not binding as to underinclusiveness, nor binding as to certain "as applied" issues the plaintiffs have raised. We turn first to overbreadth.

■ In the strict sense, overbreadth is a doctrine for facially invalidating a statute that is "so broad that it 'may inhibit the constitutionally protected speech of third parties.'" *N.Y. State Club Ass'n v. New York*, 487 U.S. 1, 11, 108 S.Ct. 2225, 2233, 101 L.Ed.2d 1 (1988) (quoting *Members of City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 798, 104 S.Ct. 2118, 2125, 80 L.Ed.2d 772 (1984)); *Regan v. Time, Inc.*, 468 U.S. 641, 651 n. 7, 104 S.Ct. 3262, 3269 n. 7, 82 L.Ed.2d 487 (1984). There must be "a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the Court." *Id.* (quoting *Taxpayers for Vincent*, 466 U.S. at 801, 104 S.Ct. at 2126). The overbreadth "must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep." *New York v. Ferber*, 458 U.S. 747, 770, 102 S.Ct. 3348, 3362, 73 L.Ed.2d 1113 (1982).

Plaintiffs argue that the Act is overbroad in this classic sense. For example, without themselves necessarily wishing to engage in such conduct, they note that solicitors may wish to put out unattended collection boxes to receive police donations. This, they say, would be noncoercive, since no one would know who donated or did not donate, yet the Act would prohibit it. Similarly, plaintiffs point out that hypothetical private citizens, unconnected with the police, are prevented by the Act from soliciting donations to law enforcement from friends—for instance, from voluntarily soliciting funds to buy a new cruiser for a local department. This, too, is said to be an example of how the Act sweeps too broadly, prohibiting protected conduct by third parties.[13]

Classic overbreadth, however, was an argument specifically presented to the Supreme Court in the *MSTA* appeal and necessarily rejected by its dismissal of that appeal for want of a substantial federal question.

When so dismissing, the Supreme Court had before it, both in M.S.T.A.'s jurisdictional statement and in its notice of appeal, appellants' explicit contention that the Act was overbroad. And, as noted *supra*, the Law Court's underlying opinion from which appeal was being taken had specifically discussed and rejected overbreadth as a ground for invalidating the Act.

It is true that in first describing the questions presented on appeal, M.S.T.A.'s jurisdictional statement—after setting out the terms of the Act—defined the question only as whether or not the Act "violates the First and Fourteenth Amendments to the United States Constitution." Later, however, under the heading of "Stated Reasons for Plenary Consideration," the jurisdictional statement urged upon the Court the desirability of its being able to question counsel as to "the overbreadth doctrine." In a footnote appended to that suggestion, M.S.T.A. stated,

> "From the outset, appellant has asserted the overbreadth doctrine of *NAACP v. Button*, 371 U.S. 415 [83 S.Ct. 328, 9 L.Ed.2d 405] (1963)."

In *NAACP*, the Court had stated, among other comments relevant to overbreadth,

---

**13.** One can also hypothesize, for purposes of overbreadth analysis, other arguably unconstitutional applications of the Act. For example, the Act might be construed to prevent private citizens from asking for money to lobby for a bill that raises police salaries. However, because the Act's prohibition runs only against fundraising for the "tangible" benefit of law enforcement, the Maine courts might well reject any such interpretation. Speculative readings like this would seem best decided, if ever sought to be enforced, in an "as-applied" lawsuit, rather than hypothesized in advance for purposes of facial overbreadth analysis. In any case, as discussed *infra*, we consider the issue of facial overbreadth to be foreclosed by the Supreme Court's summary dismissal of the *MSTA* appeal.

"Furthermore, the instant decree may be invalid if it prohibits privileged exercises of First Amendment rights whether or not the record disclosed that the petitioner has engaged in privileged conduct." *Id.* at 432, 83 S.Ct. at 337.

That overbreadth was specifically presented to, and rejected by, the Supreme Court is underscored by M.S.T.A.'s statement in its notice of appeal to the Supreme Court that appeal was taken from the portion of the Law Court's decision that "the statute in question is not overbroad." We find, therefore, that in denying the *MSTA* appeal, the Supreme Court was expressly presented with, and must therefore have rejected, the argument that the Act was unconstitutional under the First Amendment because of overbreadth.

We think the Court's rejection of overbreadth subsumed, besides the "classic" overbreadth described above, another common variety of facial overbreadth claim. The term "overbreadth" is used in First Amendment contexts not only to invalidate statutes that are so broad as to inhibit the constitutionally protected speech of third parties, *supra,* but to facially invalidate statutes that inhibit free speech and are unsupported by a sufficiently compelling state interest or are not tailored narrowly to such an interest. *See Secretary of Maryland v. Joseph H. Munson Co.,* 467 U.S. 947, 965–66 n. 13, 104 S.Ct. 2839, 2851–52 n. 13, 81 L.Ed.2d 786 (1984) ("where the defect in the statute is that the means chosen to accomplish the state's objectives are too imprecise, so that in all its applications the statute creates an unnecessary risk of chilling free speech, the statute is properly subject to facial attack."); *see also N.Y. State Club Ass'n,* 487 U.S. at 11, 108 S.Ct. at 2233; *Schaumburg,* 444 U.S. at 639, 100 S.Ct. at 837; *Taxpayers for Vincent,* 466 U.S. at 797, 104 S.Ct. at 2124.

■■■ Any present claim of facial invalidity based on a purported absence of compelling state interest in prohibiting public solicitation for the tangible benefit of law enforcement officers and agencies seems to us to be precluded by the Supreme Court's dismissal of M.S.T.A.'s appeal.[14] Similarly, a facial invalidity claim based on an alleged lack of narrow tailoring is likewise precluded. We so conclude not alone from the Law Court's own ruling in *MSTA,* which expressly found both a compelling state interest and the requisite narrow tailoring, but from express language in the jurisdictional statement submitted by M.S.T.A. when appealing to the Supreme Court from the Law Court's ruling. In that statement, as already noted, the terms of the challenged Act were set forth and an appeal on First and Fourteenth Amendment grounds noted. M.S.T.A. then went on to complain that the Law Court had held that the Act "in fact interferes with First Amendment freedoms, but that compelling state interests exist which permit the interference." M.S.T.A. characterized the Law Court's version of the compelling interest as "the interest of the State in the image of its law enforcement officers" and as "an intangible harm" allowed in the Law Court to "deprive law enforcement associations, and others, of protected First Amendment rights." M.S.T.A. urged summary reversal because the "Law Court, absent any evidence of actual or perceived coercion, apparently assumed the compelling state interest into existence based upon comments in the legislative history of the Act." M.S.T.A. urged the Supreme Court—if unwilling to reverse the Law Court summarily—to question counsel as to "the broad sweep of the State's alleged compelling interest, together with the appellant's assertion of the 'overbreadth doctrine.'" These statements were prefaced by mention of the trial court's finding that appellants had not engaged "in any form of coercion or otherwise used their official position to solicit advertising," a comment supportive of other remarks that the Law Court had rested the State's compelling interest solely on a need to conserve the "image" of its law enforcement officers.

We think the above statements necessarily alerted the Supreme Court to a claim of "overbreadth" based on the notion that the

---

14. As later sections of this opinion demonstrate, we do not regard the Court's denial of appeal in *MSTA* as barring our consideration of claims attacking the sufficiency of the State's compelling interest based on underinclusiveness (equal protection) grounds.

Act's burdens on speech went beyond any truly compelling state interest.

█ The challenged language of the present Act is virtually identical in all material respects to the statute found to be constitutional in *MSTA.* The key difference between the current version of the Act, Me.Rev.Stat. Ann. tit. 25, § 3702–A, and the prior version of the Act, Me.Rev.Stat.Ann. tit. 25, § 3702, is that the current version now provides that the prohibition on solicitation applies only when solicitation "tangibly" benefits any law enforcement officer, agency or association. This clarifies that police solicitation for charitable causes unrelated to law enforcement is not barred. Arguably, under the old statute such solicitation was barred because it intangibly benefited law enforcement by providing good will. Even assuming, however, that the addition of the word "tangible" to modify "benefits" in the present version worked a substantive change in the law, that change only narrowed the breadth of the Act's prohibition. Because § 3702–A is even narrower than the former § 3702, the Supreme Court's summary dismissal of *MSTA,* in which the Supreme Court necessarily rejected the overbreadth and compelling interest challenges described above, is binding precedent on whether § 3702–A is overbroad in the senses just discussed. *See Glen Theatre, Inc. v. Pearson,* 802 F.2d 287, 290 (7th Cir.1986) (if issue of overbreadth is raised in jurisdictional statement, Supreme Court's summary affirmance binds lower courts on that issue).

## C. *Underinclusiveness*

While the *MSTA* appeal foreclosed present overbreadth claims, appellants raise other claims which in our view, the appeal has not foreclosed. We turn to these.

█ Facial First Amendment challenge is allowed to statutes burdening speech that are so grossly *under* inclusive as to cast doubt on the compelling nature of the state's asserted interest. *See R.A.V.,* —— U.S. at ——, 112 S.Ct. at 2547 (facially invalidating ordinance that applied only to "fighting words" that provoke violence "on the basis of race, color, creed, religion or gender."); *Florida Star v. B.J.F.,* 491 U.S. 524, 541–42, 109 S.Ct. 2603, 2613–14, 105 L.Ed.2d 443 (1989) (Scalia, J., concurring) ("a law cannot be regarded as protecting an interest 'of the highest order,' and thus justifying a restriction on truthful speech, when it leaves appreciable damage to that supposedly vital interest unprohibited."); *FCC v. League of Women Voters,* 468 U.S. 364, 396, 104 S.Ct. 3106, 3126, 82 L.Ed.2d 278 (1984) ("patent ... underinclusiveness ... undermines the likelihood of a genuine [governmental] interest").[15]

█ As already discussed, the jurisdictional statement in *MSTA* required the Supreme Court to consider whether the Maine Act was supported by a compelling state interest. Plaintiffs in the present case, however, assert that even if the version of the Maine Act upheld by the Maine Law Court in *MSTA* was supported by a compelling state interest, the Supreme Court's summary dismissal of *MSTA* is no longer binding precedent because the Maine Legislature has enacted and has later repealed or let expire, various exceptions to the Act's prohibition on solicitation that benefits law enforcement. According to plaintiffs, the Legislature's former enactment of these now-defunct exceptions permanently undermined the Act's compelling interest.[16] We disagree. We know of no precedent for invalidating a statute based on repealed exceptions: the Maine legislature, having restored the statute something close to its original form, is entitled to the same respect afforded to its original judgment.

---

**15.** A statute's underinclusiveness also indicates that the government is not, in fact, serving the proffered compelling interest. *Florida Star,* 491 U.S. at 540, 109 S.Ct. at 2612 ("facial underinclusiveness of [statute] raises serious doubts about whether Florida is, in fact, serving, with this statute, the significant interests which [the State] invokes"); *Women Voters,* 468 U.S. at 396, 104 S.Ct. at 3126 (because statute is underinclusive, it "provides only ineffective or remote support for the government's purpose"); *Carey v. Brown,* 447 U.S. 455, 465, 100 S.Ct. 2286, 2292, 65 L.Ed.2d 263 (1980) ("nothing in the content-based labor-nonlabor distinction has any bearing whatsoever on privacy").

**16.** As the magistrate judge wrote in his Recommended Decision: "the proverbial egg cannot be unscrambled."

While we reject plaintiffs' assertion that repealed exceptions to the Act prevent Maine from ever again having a compelling interest in prohibiting solicitation beneficial to law enforcement, we take more seriously plaintiffs' further contention that *extant* exceptions to the Act undermine the State's assertion of a compelling state interest. Plaintiffs identify three such exceptions, said to make the Act unconstitutionally underinclusive: (1) The Act permits solicitations that intangibly benefit the police, e.g., solicitations by police officers for a public charity; (2) the Act permits solicitations that benefit state officials other than law enforcement officers; and (3) The Act permits solicitations on behalf of law enforcement officers campaigning for public office. While the latter distinctions were present in the statute upheld in *MSTA,* the issue of the Act's alleged underinclusiveness and its effect on the compelling state interest supporting the Act were not raised in either the Maine courts or in the jurisdictional statement to the Supreme Court.[17] Because the issue of the Act's purported underinclusiveness was not presented to the Supreme Court in *MSTA,* the Supreme Court's summary dismissal of that case is not binding precedent on this issue. *See Illinois State Bd. of Elections,* 440 U.S. at 183, 99 S.Ct. at 989 ("Questions which merely lurk in the record are not resolved, and no resolution of them may be inferred.") (internal quotation omitted).

The State contends that the Act's purported underinclusiveness does not render it unconstitutional. The State relies, as did the district court, on the Hatch Act cases, *see, e.g., United States Civil Serv. Comm'n v. National Ass'n of Letter Carriers,* 413 U.S. 548, 556, 93 S.Ct. 2880, 2886, 37 L.Ed.2d 796 (1973); *United Pub. Workers v. Mitchell,* 330 U.S. 75, 100, 67 S.Ct. 556, 569, 91 L.Ed. 754 (1947), for the proposition that a legislature need not address an entire social problem at one time. In the Hatch Act cases, the Supreme Court upheld restrictions on partisan political activity by civil servants even though other types of political activity were not simi-

larly restricted. But, while helpful to some degree, the Hatch Act cases are not on all fours. The Hatch Act cases rest upon the notion that the government has special rights to restrict partisan political speech of its employees and on its property. *Women Voters,* 468 U.S. at 401 n. 27, 104 S.Ct. at 3128 n. 27; *see International Soc. for Krishna Consciousness, Inc. v. Lee,* — U.S. —, —, 112 S.Ct. 2701, 2705, 120 L.Ed.2d 541 ("Where the government is acting as a proprietor, managing its internal operations, rather than acting as a lawmaker with power to regulate or license, its action will not be subjected to the heightened review to which its actions as a lawmaker may be subject."). The Hatch Act cases are inapplicable to the question of whether a statute is unconstitutionally underinclusive when that statute, like the Maine Act at issue here, restricts the speech of the general citizenry as well as that of public employees.

When a content-based regulation restricts both the speech of public employees and the general citizenry, it "simply cannot be defended on the ground that partial prohibitions may effect partial relief." *Florida Star,* 491 U.S. at 540, 109 S.Ct. at 2612. The Supreme Court explained why a statute's content-based underinclusiveness is objectionable when First Amendment rights are at stake, in *Erznoznik v. Jacksonville,* 422 U.S. 205, 95 S.Ct. 2268, 45 L.Ed.2d 125 (1975):

This Court frequently has upheld underinclusive classifications on the sound theory that a legislature may deal with one part of a problem without addressing all of it. *See, e.g., Williamson v. Lee Optical Co.,* 348 U.S. 483, 488–489 [75 S.Ct. 461, 464–465, 99 L.Ed. 563] (1955). This presumption of statutory validity, however, has less force when a classification turns on the subject matter of expression. "[A]bove all else, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Police Dept. of Chicago v. Mosley,* 408 U.S.

---

**17.** While the Maine Law Court in *MSTA* did consider the repealed Act's exception for game wardens, finding no justification for differentiating in treatment between M.S.T.A. and the game wardens, the statutory exceptions challenged by plaintiffs here either were not yet enacted when the Supreme Court summarily dismissed *MSTA,* or were not challenged in that case.

[92] at 95 [92 S.Ct. 2286 at 2290, 33 L.Ed.2d 212]. Thus, "under the Equal Protection Clause, not to mention the First Amendment itself," *id.* at 96 [92 S.Ct. at 2290], even a traffic regulation cannot discriminate on the basis of content unless there are clear reasons for the distinctions. *Id.* at 215, 95 S.Ct. at 2275–76.

In order to avoid the conclusion under either the Equal Protection Clause or the First Amendment [18] that the Maine Act is unconstitutionally underinclusive, the State must be able to point to clear reasons for the distinctions drawn by the Act. *See Austin v. Michigan State Chamber of Commerce,* 494 U.S. 652, 666, 110 S.Ct. 1391, 1401, 108 L.Ed.2d 652 (1990) (the press's "unique societal role" provides a "compelling reason for the state to exempt media corporations from the scope of political expenditure limitations"); *Mosley,* 408 U.S. at 100, 92 S.Ct. at 2292 (ordinance prohibiting all peaceful picketing other than labor picketing is unconstitutional absent showing that the former is "clearly more disruptive"); *see also Cincinnati v. Discovery Network, Inc.,* — U.S. —, —, 113 S.Ct. 1505, 1524, 123 L.Ed.2d 99 (1993) (Rehnquist, C.J., dissenting) (in noncommercial speech cases, the Court has refused to accept distinctions between restricted and nonrestricted speech when those distinctions bear "no relationship to the interests asserted for regulating the speech in the first place"); *Fantasy Book Shop, Inc. v.*

*City of Boston,* 652 F.2d 1115, 1121 n. 6 (1st Cir.1981) (rejecting challenge of facial underinclusiveness because "legislature could reasonably conclude that non-commercial amusements present sufficiently less likelihood of the harms sought to be prevented to justify their differential treatment"). The State's justifications for the Act's differential treatment must be "carefully scrutinized." *Carey,* 447 U.S. at 461–62, 100 S.Ct. at 2290–91. Although the case at hand is close, we believe the State has articulated satisfactory explanations for the Act's differential treatment.

 To justify the "exception" in § 3702–A permitting solicitations that only intangibly benefit the police, the State relies principally upon the following statement of legislative intent included in the 1991 amendments to the Act:

> The Legislature ... finds that solicitations [by police] for charitable purposes unrelated to law enforcement activities are not inherently coercive because the person solicited will know that law enforcement agencies or officers do not gain any tangible benefit and, consequently, will not be concerned with who donates.

Priv. & Spec.Laws 1991, Ch. 510, § 5. We find this to be a supportable basis for the distinction. It is true that the State has provided no purported empirical evidence to back up that finding.[19] The district court, in

---

18. When reviewing content-based distinctions, the Supreme Court has not differentiated the Equal Protection Clause from the First Amendment. *R.A.V.,* — U.S. at — n. 4, 112 S.Ct. at 2544 n. 4 ("This Court ... has occasionally fused the First Amendment into the Equal Protection Clause"); *Burson,* — U.S. at —–— n. 3, 112 S.Ct. at 1850–52 n. 3 ("Under either a free-speech or equal-protection theory, a content-based regulation of political speech in a public forum is valid only if it can survive strict scrutiny."); *Erznoznik,* 422 U.S. at 215, 95 S.Ct. at 2276 (holding that under either the First Amendment or the Equal Protection Clause, there must be "clear reasons" for content-based distinctions); *Mosley,* 408 U.S. 92, 95, 92 S.Ct. 2286, 2290, 33 L.Ed.2d 212 (1972) ("Of course, the equal protection claim in this case is closely intertwined with First Amendment interests."); *Harwin v. Goleta Water Dist.,* 953 F.2d 488, 490 n. 3 (9th Cir.1991) ("Under either [equal protection or first amendment] analysis, ... independent justification of the discrimination is re-

quired."); *News America Pub. v. FCC,* 844 F.2d 800, 804 (D.C.Cir.1988) (claim of underinclusiveness "lies at the intersection of the First Amendment's protection of free speech and the Equal Protection Clause's requirement that government afford similar treatment to similarly situated persons").

19. Plaintiffs contend that by simply asserting without empirical evidence that solicitations tangibly benefiting police are inherently coercive, the State has:

> taken the *effect* of the statute and posited that effect as the State's interest. If accepted, this sort of circular defense can sidestep judicial review of almost any statute, because it makes all statutes look narrowly tailored.... "Every content-based discrimination could be upheld by simply observing that the State is anxious to regulate the designated speech."

*Simon & Schuster,* — U.S. at —, 112 S.Ct. at 510 (quoting *Simon & Schuster, Inc. v. Fischetti,*

upholding the constitutionality of the Act, stated that it would overlook the lack of empirical evidence and defer to the "legislative premise that these types of fundraising are different," since whether there is as much coercion in solicitations for charitable causes as for law enforcement purposes is a matter "on which reasonable minds may differ."

We agree that the lack of empirical evidence is not fatal. *See Burson,* —— U.S. at ——, 112 S.Ct. at 1856 (noting the difficulty of "isolat[ing] the exact effect of [laws restricting certain speech at polling places] on voter intimidation and election fraud" and suggesting that "[s]uccessful voter intimidation and election fraud is successful precisely because it is difficult to detect"); *Frisby v. Schultz,* 487 U.S. 474, 486, 108 S.Ct. 2495, 2503, 101 L.Ed.2d 420 (1988) (noting that targeted residential picketing is "inherently" intrusive of residential property). While the Supreme Court has occasionally cited the lack of empirical evidence as a further ground for striking down a restriction on speech, *see, e.g., Peel v. Attorney Registration & Disciplinary Comm'n,* 496 U.S. 91, 106, 110 S.Ct. 2281, 2290, 110 L.Ed.2d 83 (1990) (plurality) ("Given the complete absence of any evidence of deception," Court rejects state's contention that attorney's advertising was actually misleading), the Court has never laid down a categorical rule requiring that empirical evidence be shown to support every statutory restriction on speech.[20] A categorical requirement would be unwise, we think, given the difficulty of securing definitive empirical evidence for unquantifiable issues of this sort.

The Maine Legislature's conclusion seems intuitively reasonable that solicitations—even when made by law enforcement personnel—for charitable purposes unrelated to law enforcement are not as inherently coercive as solicitations that tangibly benefit law enforcement officers, agencies or associations. Persons approached to contribute funds for the tangible benefit of law enforcement personnel, agencies or associations might well believe that the officers would be more deeply offended by a refusal than by rejection of officers' requests for a donation to a charity entirely unrelated to law enforcement. The Legislature "could reasonably conclude that [charitable solicitations] present sufficiently less likelihood of the harms sought to be prevented to justify their differential treatment." *See Fantasy Book Shop, Inc.,* 652 F.2d at 1121 n. 6.

Plaintiffs' contention with respect to the Act's distinction between law enforcement officials and other types of public servants fares no better. The police occupy a unique role. They are empowered to enforce a wide array of criminal laws and to protect the property and lives of the general citizenry. To do this they are armed, given enhanced arrest powers, and given access to information networks and other tools denied to most citizens. Police necessarily have considerable on-the-spot authority of a discretionary sort—whether to give or withhold a traffic ticket, to make an arrest, or to notice or disregard a violation. While evenhanded treatment is the ideal, officers may, and sometimes do, enforce laws in a less than neutral manner. For this reason, citizens and local businesses will try to stay on the good side of police, fearing—whether or not correctly—that a miffed police officer and his associates will retaliate, or will turn their

916 F.2d 777, 785 (2d Cir.1990) (Newman, J., dissenting)).

Plaintiffs' reliance on *Simon & Schuster* is misplaced. In that case, New York argued that its Son-of-Sam law was supported by a compelling interest because it "ensur[ed] that criminals do not profit from story-telling about their crimes before their victims have a meaningful opportunity to be compensated for their injuries." The Court rejected New York's argument that this narrow interest was compelling because the State could not explain why it "should have any greater interest in compensating victims from the proceeds of such 'storytelling' than from any of the criminal's other assets." *Id.* By contrast, the State of Maine can and does explain why solicitations by police personnel for charitable purposes unrelated to law enforcement are not as inherently coercive as solicitations that tangibly benefit law enforcement officers, agencies or associations.

**20.** The Court has, however, required "substantial support in the record or findings" when "rights of political expression and association" are concerned. *E.g., In re Primus,* 436 U.S. 412, 434 n. 27, 98 S.Ct. 1893, 1906 n. 27, 56 L.Ed.2d 417 (1978).

backs when most needed. Hence, the Maine Legislature could reasonably conclude that police solicitation has a special potential for coercion not present in solicitation by other officials.

▪ Plaintiffs' third example of the Act's purported underinclusiveness—the exception for solicitations on behalf of law enforcement officers running for public office—is also unavailing. As the district court properly recognized, law enforcement officers who run for electoral office, primarily county sheriffs, themselves have separate First Amendment interests. *See Burson,* —— U.S. at ——, 112 S.Ct. at 1850 ("'the First Amendment 'has its fullest and most urgent application' to speech uttered during a campaign for political office'") (quoting *Eu v. San Francisco Democratic Comm.,* 489 U.S. 214, 223, 109 S.Ct. 1013, 1020, 103 L.Ed.2d 271 (1989) (quoting *Monitor Patriot Co. v. Roy,* 401 U.S. 265, 272, 91 S.Ct. 621, 625, 28 L.Ed.2d 35 (1971))). A rule prohibiting "campaign fundraising by law enforcement personnel would effectively disqualify them from an office such as sheriff for, unless they were independently wealthy, they could easily be outspent by opponents who were not in law enforcement." *Auburn II,* 798 F.Supp. at 827. We, therefore, agree with the district court that the First Amendment right of law enforcement officers to engage in campaign speech provides a substantial justification for the Act's exemption of such speech from its prohibition on solicitation.[21] *See Austin,* 494

U.S. at 668, 110 S.Ct. at 1402 (media exemption from prohibition on corporations using general treasury funds to support state candidate elections "ensures that the Act does not hinder or prevent the institutional press from reporting on, and publishing editorials about, newsworthy events").

As the State can furnish "clear reasons" for the asserted exemptions from the Act's prohibitions, and the reasons are not only clear but rational, we hold that the Maine Act is not unconstitutionally underinclusive.

### D. *As Applied Challenge*

▪ Plaintiffs argue that the Act is unconstitutional as applied to the activities of plaintiff R.H. McKnight Co., a professional fundraiser and publisher of law enforcement magazines; plaintiff Charles Underwood, a private citizen who wishes to advertise in such magazines;[22] and the plaintiff law enforcement association which wishes to disseminate the magazines.[23] Plaintiffs contend that the sale of advertising in law enforcement publications like the "Maine State Trooper" is a noncoercive undertaking. Plaintiffs point specifically to the allegedly noncoercive nature of the system of solicitation designed by R.H. McKnight Co., in which telephone solicitors supposedly make it clear that they are not police officers, and the names of persons who do not purchase adver-

---

**21.** To the extent that coercion is caused by police solicitations for campaign fundraising, the State has attempted to minimize it by imposing certain restrictions on such solicitations. For example, Me.Rev.Stat.Ann. tit. 25, § 3711 prohibits solicitations by law enforcement officers while in uniform. Section 3712 prohibits any law enforcement officer running for a nonpartisan public office from soliciting on his own behalf. Me.Rev. Stat.Ann. tit. 25, § 3712. Section 3713 prohibits the use of coercion in solicitations. Me.Rev.Stat. Ann. tit. 25, § 3713. Section 3714 makes a violation of these restrictions a Class E crime. Me.Rev.Stat.Ann. tit. 25, § 3714. Other restrictions on law enforcement officers running for elective office are contained in statute, union contracts and departmental regulations. *See* Me. Rev.Stat.Ann. tit. 30-A, § 355 (Pamph.1991) (regulating political activity of sheriffs and deputy sheriffs). Together, these restrictions serve as an effective accommodation of the First Amendment right of the police to engage in political

speech with the State's interest in preventing coercion inherent in police solicitation.

**22.** We note that plaintiff Underwood can raise no "as applied" challenge with regard to his right to advertise in the police magazines, as the statute does not prohibit him from advertising but from being *solicited* to advertise. As such, his claim is rightly considered along with those of plaintiff R.H. McKnight Co. and the plaintiff law enforcement association.

**23.** It is debatable whether plaintiffs can bring an as-applied challenge in the context of a pre-enforcement declaratory judgment action. *See United States v. Gaudreau,* 860 F.2d 357, 360–61 (10th Cir.1988) ("In a declaratory judgment action no one has been charged so the court cannot evaluate the statute as applied."). Rather than embark upon technicalities, however, we prefer to consider their arguments on the merits.

tisements are not directly released to the sponsoring law enforcement organization.[24]

Contrary to plaintiffs' view, we think the Maine Legislature could believe that solicitation of advertisements to benefit law enforcement is inherently coercive because the persons solicited will experience pressure to purchase an advertisement so that their support of law enforcement will become known to police or so that their failure to buy an advertisement will not be noticed. The Legislature could reasonably doubt that the solicitations would become noncoercive merely because the names of those who do not purchase advertisements were promised not to be disclosed to the police. The advertisements will be public. Accordingly, law enforcement officers will be aware of who contributed and, by the absence of advertisements, of who did not contribute. Moreover, those solicited may not believe, even if they are assured, that their names will not be communicated. The Law Court in *MSTA* was of the view that, quite apart from actual coercion, the state's legitimate interest in-

cluded maintaining the good public reputation of its police. We are not persuaded that plaintiffs' alternatives would necessarily answer that concern.

Because plaintiffs' proposed solicitations remain inherently coercive, or at least do not remove the appearance of coercion and favoritism, we reject plaintiffs' argument that the Act is unconstitutional as applied.

### E. *Prior Restraint*

■ Any violation of the Act's prohibition on solicitation that tangibly benefits law enforcement is considered a violation of the Maine Unfair Trade Practices Act. · Me.Rev. Stat. tit. 25, § 3702–A. The Act, therefore, can be enforced either through civil penalties or injunctive relief. Finding that enforcement of the Act through injunctive relief would constitute an impermissible prior restraint, the district court declared the injunctive relief provision of the Act to be unconstitutional.[25] While the district court's concern

24. A sample script utilized by R.H. McKnight telephone solicitors states the following:

> *AUBURN CONSENT FORM/SALES PRESENTATION*
>
> Hello, ———. This is ——— calling on behalf of the Auburn Police I.B.P.O. 414.
>
> I am working for the publishing company, and, as you may already know, we are going to be producing the Auburn Police I.B.P.O. # 414 Yearbook. This Yearbook will be of the highest quality with a full 8½ × 11, four-color cover, and will contain pictures of the officers in *action here in Auburn as well as articles of* interest to the general public.
>
> We anticipate that our publication will be the best in the Auburn–Lewiston area. We will be producing 750 copies of our publication and giving them out free of charge to the public, libraries or business friends, as well as the officers of Auburn. Funds derived from the sale of advertising will go to scholarship fund (sic), as well as to improve law enforcement and the working·conditions of the officers right here in Auburn.
>
> May I tell you the advertising prices?
>
> In addition, each telephone solicitor must sign the following agreement before calling on behalf of a police organization:
>
> CONSENT
>
> I ——— agree to adhere to the above sales presentation for the Auburn Police International Brotherhood of Police Officers Local # 414. I *will not* state or imply that I am an Auburn Police Officer—only that I am calling on behalf

of: (sic) and that I work for the publishing company.

Affidavit of R.H. McKnight, Appendix 1.

Finally, although the names of those who do not purchase advertising are not directly disclosed to the police organization, a disclosure and thank you is mailed to each advertiser in the name of the police organization:

> Please make your check payable to the Auburn Police I.B.P.O. Local # 414 and send with your ad copy, letterhead, or business card to: P.O. Box 3291, Auburn, Maine 04212. The International Brotherhood of Police Officers Local # 414 is a non-profit organization, not a charitable organization. Therefore, your payment can be deducted as an advertising expense only. Thank you for your support. With your help we are able to go forward. The telephone call you received was from a representative of the publishing company and not a member of the Police Department. Officers do not elect to solicit as it may unduly influence your decision. If you have any questions, please don't hesitate to ask.

25. Plaintiffs actually argued to the district court, and to this court, that the Act's categorical prohibition on solicitation, in and of itself, constitutes an unconstitutional prior restraint. According to plaintiffs, the Act constitutes a prior restraint because it "silences by fiat an entire category of charitable solicitation." *Auburn I*, 756 F.Supp. at 618. In this respect, argue plaintiffs, the Act is "a form of censorship; .it prejudges rather than punishes after the fact." *Id.* Plaintiffs fur-

that injunctions are rarely tolerated in the First Amendment context is understandable, we think the court acted improperly in invalidating the Act's injunctive relief provision on its face.

■ A prior restraint is a government regulation that limits or conditions in advance the exercise of protected First Amendment activity. *Fantasy Book Shop, Inc.*, 652 F.2d at 1120. Although the classic form of prior restraint involves an administrative licensing scheme, *see Jews for Jesus, Inc. v. Massachusetts Bay Transp. Auth.*, 984, F.2d 1319, 1326–27 (1st Cir.1993), a judicial injunction that prohibits speech prior to a determination that the speech is unprotected also constitutes a prior restraint. *See Near v. Minnesota*, 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357 (1931). Any system of prior restraints of speech "comes to this Court bearing a heavy presumption against its constitutional validity." *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 558, 95 S.Ct. 1239, 1246, 43 L.Ed.2d 448 (1975); *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70, 83 S.Ct. 631, 639, 9 L.Ed.2d 584 (1963); *New York Times Co. v. United States*, 403 U.S. 713, 714, 91 S.Ct. 2140, 2141, 29 L.Ed.2d 822 (1971); *Organization for a Better Austin v. Keefe*, 402 U.S. 415, 419, 91 S.Ct. 1575, 1577, 29 L.Ed.2d 1 (1971).

■ The presumption against the constitutionality of prior restraints is heavier than that against restrictions on speech imposed by subsequent penalties. *Vance v. Universal Amusement Co.*, 445 U.S. 308, 315–16, 100 S.Ct. 1156, 1161–62, 63 L.Ed.2d 413 (1980); *Southeastern Promotions Ltd.*, 420 U.S. at 558–59, 95 S.Ct. at 1246–47; *New York Times Co.*, 403 U.S. at 733, 91 S.Ct. at 2151 (White, J., concurring). The Supreme Court has explained the rationale behind this heavy presumption against prior restraints as follows:

> Behind the distinction is a theory deeply etched in our law: a free society prefers to punish the few who abuse rights of speech *after* they break the law than to throttle them and all others beforehand. It is always difficult to know in advance what an individual will say, and the line between legitimate and illegitimate speech is often so finely drawn that the risks of freewheeling censorship are formidable.

*Southeastern Promotions Ltd.*, 420 U.S. at 559, 95 S.Ct. at 1247.

■ The Supreme Court, however, "has never held that all injunctions are impermissible." *Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations*, 413 U.S. 376, 390, 93 S.Ct. 2553, 2561, 37 L.Ed.2d 669 (1973). "The special vice of a prior restraint is that communication will be suppressed, either directly or by inducing excessive caution in the speaker, before an adequate determination that it is unprotected by the First Amendment." *Id.* An injunction that is narrowly tailored, based upon a continuing course of repetitive speech, and granted only after a final adjudication on the merits that the speech is unprotected does not constitute an unlawful prior restraint. *See id.; Securities & Exchange Comm'n v. Wall St. Publ. Institute, Inc.*, 851 F.2d 365, 370 (D.C.Cir. 1988). The Maine courts may interpret the statute or apply it so as to avoid the issuance of ex parte restraining orders or even temporary injunctions, using their equitable powers only following full hearings and final adjudications.

■ Because plaintiffs brought this action seeking pre-enforcement declaratory relief, there is, at present, no injunction restraining solicitation activities. Without having before us the concrete example of a

---

ther contend that barring solicitation of funds is a particularly effective prior restraint because law enforcement agencies will not have the financial resources to spread their message to the general public.

The district court correctly rejected plaintiffs' arguments that the entire Act should be invalidated as a prior restraint. Under plaintiffs' analysis, almost any regulation of speech would be considered a prior restraint since most restric-

tions on speech will have consequences on later speech. While the Supreme Court has cautioned that "[b]road prophylactic rules in the area of free expression are suspect," *Riley*, 487 U.S. at 801, 108 S.Ct. at 2680, the Court has never said that a categorical ban on speech is a per se prior restraint. Instead, the Court has, for the most part, carefully limited the prior restraint doctrine to administrative and judicial orders prohibiting speech before it is actually uttered.

particular injunction, it is difficult, if not impossible, for us to determine whether the prior restraint doctrine has or will be violated.[26] *See American Library Ass'n v. Barr,* 956 F.2d 1178, 1190 (D.C.Cir.1992) ("Whether use forfeiture constituted a restraint on speech, prior or otherwise, would seem to depend on the nature of the property and the circumstances of the offender, about which we have no information in this case."). We choose to let stand the Act's provision authorizing enforcement through injunctive relief and leave for another day the determination whether a specific injunction—should the State decide to proceed in such a fashion—constitutes an unlawful prior restraint.

### III.

We hold that Maine's Solicitation by Law Enforcement Officers Act, Me.Rev.Stat.Ann. tit. 25, § 3702–A, does not violate the First or the Fourteenth Amendments of the United States Constitution. The district court's determination that Me.Rev.Stat.Ann. tit. 25, § 3702–A is not unconstitutionally overbroad or underinclusive is *affirmed.* The court's declaration that the Act's provision for enforcement through injunctive relief is unconstitutional is *reversed.*

Costs to the State of Maine.

### APPENDIX

### STATE OF MAINE

An Act to Amend the Laws Concerning
Solicitation by Law Enforcement
Officers

Be it enacted by the People of the State of Maine as follows:

. . . .

**Sec. 5. Legislative intent.** It is the intent of the Legislature to repeal all exceptions to the prohibition against solicitation by law enforcement agencies, officers and associations. The Legislature finds that the various exceptions to the prohibition enacted over the years, in fact, have led to inherently coercive solicitations and that those exceptions ultimately undermine the integrity of law enforcement. As a consequence, the Legislature repeals these exceptions and re-enacts the prohibition on solicitations by or on behalf of law enforcement. The Legislature further finds that solicitations for charitable purposes unrelated to law enforcement activities are not inherently coercive because the person solicited will know that law enforcement agencies or officers do not gain any tangible benefit and, consequently, will not be concerned with who donates. This Act clarifies and reaffirms that the primary and compelling purpose underlying the laws governing solicitation by law enforcement officers is to eliminate the coercion that is inherent in solicitations by and on behalf of law enforcement officers by prohibiting such solicitations. When a law enforcement officer solicits from a prospective donor, the donor may not feel totally free to reject the request in light of the officer's position. This occurs regardless of the subjective intent of the officer to coerce the prospective donor. In addition to the effect on the prospective donor, the appearance of the transaction to 3rd persons may undermine public confidence in the integrity of the public office. At least the appearance of coercion inheres in every solicitation that tangibly benefits law enforcement agents and the appearance undermines the integrity of the office. The Legislature finds that the State has a compelling interest in preserving the integrity of law enforcement officers and finds that regu-

**26.** Injunctions, in this respect, are distinguishable from administrative licensing schemes that constitute prior restraints. "[W]hen a licensing statute vests unbridled discretion in a government official over whether to permit or deny expressive activity, one who is subject to the law may challenge it facially without the necessity of first applying for, and being denied, a license." *Lakewood v. Plain Dealer Pub. Co.,* 486 U.S. 750, 755–56, 108 S.Ct. 2138, 2143, 100 L.Ed.2d 771 (1988); *see, e.g., FW/PBS, Inc. v. Dallas,* 493 U.S. 215, 110 S.Ct. 596, 107 L.Ed.2d 603 (1990); *Freedman v. Maryland,* 380 U.S. 51, 56, 85 S.Ct. 734, 737, 13 L.Ed.2d 649 (1965). In such cases, it is the very existence of unbridled discretion that is constitutionally unacceptable because it "intimidates parties into censoring their own speech, even if the discretion and power are never actually abused." *Lakewood,* 486 U.S. at 756, 108 S.Ct. at 2143. By contrast, the statutory authority to issue an injunction does not create the same danger.

905

lating all law enforcement solicitations that tangibly benefit law enforcement is necessary to promote this compelling state interest. [Priv. & Spec.Laws 1991, Ch. 510.]