DA 07-0084

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2008 MT 44

ST. JAMES HEALTHCARE,

      Plaintiff and Appellee,

  v.

JESSE A. COLE, M.D.,

      Defendant and Appellant.

APPEAL FROM:   District Court of the Second Judicial District,
In and For the County of Silver Bow, Cause No. DV-2006-264
Honorable Kurt Krueger, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

            C. Richard Anderson, Michael J. McKeon, McKeon & Anderson,
P.C., Butte, Montana

            Mark A. Vucurovich, Henningson, Richardson & Vucurovich, P.C.,
Butte, Montana

      For Appellee:

            A. Clifford Edwards, Roberta Anner-Hughes, Edwards, Frickle,
Anner-Hughes & Culver, Billings, MT

      For Amici:

            James P. Molloy, Molloy Law Firm, Helena, Montana

Submitted on Briefs: October 24, 2007

Decided: February 12, 2008

Filed:

_____
Clerk

Justice Patricia O. Cotter delivered the Opinion of the Court.

¶1 Appellant Jesse A. Cole, M.D., appeals the issuance of an injunction in the Second Judicial District, Silver Bow County. We affirm in part, reverse in part, and remand for further proceedings consistent with this Opinion.

## FACTUAL AND PROCEDURAL BACKGROUND

¶2 Dr. Cole is a licensed physician in the State of Montana who practices radiology in Butte, Montana. He was the head of radiology at St. James Healthcare (St. James) beginning in 1999, and had an exclusive contract with St. James to provide radiology services there. In January 2005 St. James terminated this exclusive contract. St. James stated it took this action because it had received a number of complaints about Dr. Cole's billing practices, alleging that he had been billing patients in excess of the allowances provided for by Blue Cross/Blue Shield. This practice was problematic for St. James because it wished to expand its radiology services and employ physicians who would accept and work with Blue Cross/Blue Shield. However, in spite of the termination of his exclusive contract, Dr. Cole continued to provide the vast majority of radiology services for St. James.

¶3 By October 2006 St. James was in negotiations with Dr. Anna Chacko, a radiologist and vice chair of Radiology at Boston University Medical Center in Boston, Massachusetts, to provide radiology services for St. James. Dr. Chacko was negotiating with James Kiser, the CEO of St. James, and Scott Steinfelt of Southwest Montana Radiology (SWMR) to expand radiology services provided at St. James under the aegis

3

of Boston University. Dr. Chacko was to serve as a contact person among St. James, SWMR and Boston University in developing this relationship.

¶4 In late October 2006 Dr. Chacko visited Butte to negotiate directly with St. James. When she returned to Boston University she discovered that Dr. Cole had left her an email message, dated October 23, 2006, in which he requested the opportunity to speak with her. Prior to this email, Dr. Chacko had never had any contact with Dr. Cole. This email read, in part, as follows:

> Dear Dr. Chacko,
>
> My name is Jesse Cole. I am one of the radiologists who is currently practicing at St. James Healthcare in Butte.
> . . . .
>
> The reason I am writing you is because I would like to speak with you, preferably in person before you leave Butte. I think there are some things you should know about this situation. . . .
>
> This situation is fairly difficult, and I will tell you that essentially this is a predatory situation and I know from speaking to other people who have come through here that they have not had things fully explained. Don't think I am dissuading your [sic] from coming here or trying to interfere with your business relationships in any way by writing this to you.
>
> Thanks, I look forward to hearing from you soon.
>
> Sincerely,
>
> Jesse Cole

¶5 After receiving this email, Dr. Chacko contacted James Kiser for his approval to speak with Dr. Cole. Dr. Chacko called Dr. Cole after receiving this permission. At the beginning of this call, Dr. Cole informed Dr. Chacko that the call had to be teleconferenced with other some other doctors who practice radiology at St. James. Dr.

4

Chacko insisted that she have her lawyer present if other parties were on the line. According to Dr. Chacko, Dr. Cole's voice and manner changed irrationally at that point and he became very angry and "he seemed to be sputtering with rage." Dr. Cole then informed Dr. Chacko that he would be calling, among others, the chairman of her department, the dean of the medical school, the American College of Graduate Medical Education, the American Board of Radiology, and the American College of Radiology.

¶6 According to Dr. Chacko, Dr. Cole then told her that "bad things can happen to you." Dr. Chacko informed Dr. Cole that their conversation was over and hung up the phone. After this interaction, Dr. Chacko became concerned for her physical safety. She later testified that she interpreted Dr. Cole's comments as a direct threat to her physical safety. After the call, Dr. Chacko contacted Mr. Kiser and asked him to do something about this situation, stating that she was concerned for her safety. She further informed St. James that if it did not address her concerns, neither she nor Boston University Medical School would be willing to work with St. James.

¶7 Meanwhile, Dr. Cole contacted the dean of the Boston University Medical School, Dr. Karen Antman, and Dr. Chacko's immediate supervisor, Dr. Alex Norbash, chair of the Board of the Department of Radiology at Boston University, as well as other employees of Boston University. In an email addressed to Dr. Antman, for instance, Dr. Cole stated that he was preparing to send a letter to United States Senator Max Baucus and other governmental agencies regarding the legality of "federally funded residency/fellowship teaching programs and the ramifications of their participation in private medical practice groups with regards to federal funding, etc." Another email sent

5

to Dr. Antman referred to "some problems out here in Butte" that she and Dr. Norbash "may not be aware of," and offered to send Dr. Antman "some information which is confidential, as it comes from our hospital radiology department director . . . and I would not want to get her in trouble." This email concluded with the following:

> Please call me at your earliest convenience or email me so we can set up a time to just talk. I have to say, as a radiologist I have seen the dark underbelly of practice and the lengths to which hospital administrators will sink to get power over physicians, and I have been through this once before here with another administrator and a rather unscrupulous radiology contract company. But I never thought I would see teaching programs in radiology getting involved in such a situation such as this without full disclosure and it greatly bothers me that your Dr. Norbash and Dr. Chacko would not have the courtesy to meet with the local radiologists.

¶8 In light of Dr. Cole's unwelcomed interference in these negotiations and his previous statements to Dr. Chacko, Dr. Chacko informed St. James that Boston University would be unwilling to go forward in negotiations with St. James unless some action was taken with respect to Dr. Cole. Dr. Chacko stated she had been involved in meetings with the executive vice president and senior administrator at Boston University, and that during those meetings concerns were expressed about what Dr. Cole might do next. Moreover, Dr. Chacko testified that she was concerned about Dr. Cole's continuing communications from a professional standpoint and opined that Boston University might conclude that the deal was too problematic, leaving Dr. Chacko without the aegis of the University.

¶9 In response to these concerns, the St. James Board of Trustees sought a restraining order against Dr. Cole enjoining him from engaging in threatening or harassing conduct

6

towards Dr. Chacko and members of Boston University. The District Court granted a temporary restraining order against Dr. Cole on November 6, 2006. In that order, the District Court ordered Dr. Cole to appear at a subsequent hearing in order to show cause why the order should not be made permanent. A hearing was held on November 17, 2006, at which time the District Court extended the temporary restraining order until a further ruling on the matter.

¶10 At the hearing, the District Court learned that the St. James Board of Trustees had received other complaints against Dr. Cole concerning incidents where he had threatened, harassed, or intimidated other radiologists who were employed with St. James or whom the Board had attempted to contact. One incident of prior harassment concerned Dr. Dan Alzheimer of Sheridan Memorial Hospital in Sheridan, Wyoming. In 1995 Dr. Alzheimer built a radiology imaging center in Butte called Silver-Bow Imaging and hired Dr. Cole to work for him. In the course of getting to know Dr. Cole, Dr. Alzheimer had been to his house where Dr. Cole had shown him two 64-gun vaults, one of which was full of weapons. Later, Dr. Alzheimer moved to Sheridan but provided radiology services for St. James on an occasional basis. One evening Dr. Alzheimer received a call from Dr. Cole insisting that he be on call that night. Dr. Alzheimer explained this would be difficult since he lived approximately five hours from Butte. Soon thereafter, Dr. Alzheimer received a call from the staff at Sheridan Memorial Hospital saying that Dr. Cole had just called there demanding to speak with the hospital CEO and nursing staff superintendent at Sheridan Memorial Hospital. Dr. Alzheimer told the staff at Sheridan Memorial to give Dr. Cole those phone numbers so he could contact them.

¶11     Later that evening Dr. Cole called Dr. Alzheimer a second time, but this time Dr. Alzheimer's 15 year-old son answered the phone.  After the conversation, Dr. Alzheimer's son asked him if he was going to jail based on the conversation he had just had with Dr. Cole.  Dr. Alzheimer told the District Court that the call had upset his son and that he had to reassure him he was not going to jail.  Around 10:30 p.m. that same evening, Dr. Alzheimer received a call from the CEO of Sheridan Memorial Hospital, after he had spoken with Dr. Cole, asking Dr. Alzheimer what was going on with St. James.

¶12     The weekend after these incidents, Dr. Alzheimer took a call at St. James.  He became concerned for his safety after learning from hospital staff that Dr. Cole had told them he would be there to personally greet him.  The combination of these events prompted Dr. Alzheimer to fear for his safety to such an extent that he called the police in Butte and asked them to be available immediately if he called for their assistance.

¶13     Subsequent to this weekend Dr. Cole continued to harass Dr. Alzheimer.  Dr. Cole purchased false and misleading newspaper and radio ads in the Sheridan newspaper and on local radio stations.  The newspaper ad read as follows:

> Congratulations, Daniel Alzheimer, M.D. . . . of Sheridan, Wyoming on your new practice at Southwest Montana Radiology, 820 W. Platinum in Butte, Montana, who will be providing daily personal, on site radiology services beginning March 22nd, 2006.  Jessie A. Cole, M.D.

¶14     The radio ad, which falsely stated it was from the Sheridan Memorial Hospital's Department of Radiology, but was in reality purchased by Dr. Cole, stated:

> Congratulations to radiologists Dan Alzheimer and Jason White from Sheridan's Memorial Hospital's Department of Radiology.  Dr. Alzheimer

8

and White now have a new practice in Butte, Montana. Dr.'s Alzheimer and White will be traveling to Butte every weekday to see patients at Southwest Montana Radiology for all their radiology needs. Again, congratulations to Dr. Dan Alzheimer and Jason White from Sheridan Memorial Hospital's Department of Radiology on their new practice in Butte, Montana.

¶15 Because of these false ads, Dr. Alzheimer received over fifty calls from patients wanting to know why he was leaving town. Dr. Alzheimer testified before the District Court that he continues to feel intimidation and fear of Dr. Cole when he practices radiology in Butte. Dr. Alzheimer further testified that the temporary restraining order against Dr. Cole made him feel safer when working in Butte and asked the District Court that it remain in place.

¶16 Similarly, another radiologist, Dr. Zurich, had made previous reports to St. James that he had been threatened and intimidated by Dr. Cole and refused to come to Butte to practice radiology as a result of Dr. Cole's conduct. Additionally, the chairman of the Board of Trustees for St. James also testified that she was personally afraid of Dr. Cole, but that she felt comfortable testifying with the restraining order in place. Similarly, Dr. Chacko testified that with the restraining order in place she felt safe and comfortable enough to return to Butte and continue her negotiations with St. James. Lastly, Dr. Cole admitted to the District Court that he had brought firearms to St. James, leaving them in his pickup or car.

¶17 In light of the evidence before it, the District Court ordered that the injunction against Dr. Cole be made permanent on January 17, 2007. That injunction read as follows:

9

That Jesse A. Cole, M.D., is enjoined from engaging in any of the following:

(a) Calling, writing, or coming into contact of any kind, with Dr. Chacko, her supervisors, or any member of Boston University, either directly or indirectly;

(b) Threatening any type of professional or physical harm to Dr. Chacko, her supervisors, or any member of Boston University, either directly or indirectly;

(c) Coming within 250 feet of Dr. Chacko;

(d) Indicating to patients, potential patients or physicians, that Dr. Chacko, or the radiology services offered by St. James, are in any manner inadequate or unprofessional, either directly or indirectly;

(e) Calling, writing, or have contact of any kind, with any potential candidate for the radiology department at St. James, that would discourage or intimidate such candidate from negotiating or contracting with St. James, either directly or indirectly; and

(f) Threatening any employee or agent of St. James verbally or physically, either directly or indirectly.

¶18 The District Court found that St. James met its burden under § 27-19-201, MCA, demonstrating that without the injunction in place it would suffer immediate and irreparable damages. Those damages included threats and harassment against others which would result in the loss of a unique business opportunity for St. James and its patients. The District Court further found that St. James had a right to seek such an injunction for persons who visit or work at its facility, and that the "[s]peech that Dr. Cole has engaged in, which is harassing, intimidating, or threatening, is not protected by the Constitution."

¶19 Dr. Cole now timely appeals the issuance of the injunction by the District Court.

**ISSUE**

¶20 We state the issue on appeal as follows: *Did the District Court manifestly abuse its discretion when it granted St. James a permanent injunction against Dr. Cole?*

10

**STANDARD OF REVIEW**

¶21 We review the granting or denial of a temporary or permanent injunction under the "manifest abuse of discretion" standard. *Shammel v. Canyon Resources Corp.*, 2003 MT 372, ¶ 12, 319 Mont. 132, ¶ 12, 82 P.3d 912, ¶ 12. "A manifest abuse of discretion is one that is obvious, evident, or unmistakable." *Shammel*, ¶ 12 (quotation omitted). Where the issuance of an injunction is based upon conclusions of law, we review those conclusions to determine if they are correct. *Benefis Healthcare v. Great Falls Clinic, LLP*, 2006 MT 254, ¶ 11, 334 Mont. 86, ¶ 11, 146 P.3d 714, ¶ 11; *M. H. v. Mont. High Sch. Assn.*, 280 Mont. 123, 130, 929 P.2d 239, 243 (1996).

**DISCUSSION**

¶22 Dr. Cole maintains the District Court committed a manifest abuse of discretion in granting the injunction to St. James. Dr. Cole advances several distinct arguments in support of his position. On the one hand, he maintains the injunction is an unconstitutional prior restraint on his right to free speech under the First Amendment to the U.S. Constitution and Article II, Section 7 of the Montana Constitution. Additionally, Dr. Cole maintains the injunction issued against him is infirm because: (1) the District Court did not have sufficient evidence to justify enjoining him from the conduct and adopted verbatim St. James' proposed Findings of Fact and Conclusion of Law; (2) St. James did not have standing to seek a protective order for Dr. Chacko, her supervisors, members of Boston University, and the employees, agents, potential candidates, or patients of St James; and (3) injunctive relief was not available to St. James as a matter of law since the alleged harm could have been remedied by money.

11

¶23 The threshold question in this case is whether the injunction by its very terms amounts to an unconstitutional prior restraint on free speech. After examining this question, we will consider whether the injunction suffers from the additional infirmities as claimed by Dr. Cole.

**A. Injunction as an Unconstitutional Prior Restraint of Free Speech**

¶24 The District Court concluded that the speech Dr. Cole was enjoined from engaging in was harassing, intimidating, or threatening, and therefore not constitutionally protected. Dr. Cole maintains this was error. In particular, Dr. Cole argues that the District Court failed to properly evaluate whether the terms of the injunction constituted an unconstitutional prior restraint on free speech under *Nebraska Press Assn. v. Stuart*, 427 U.S. 539, 96 S. Ct. 2791 (1976) and *Kuiper v. Dist. Ct. of the Eighth Jud. Dist.*, 193 Mont. 452, 632 P.2d 694 (1981). Dr. Cole asserts that under *Kuiper* and *Nebraska Press*, the District Court was required to adhere to the following test but failed to do so:

> Before a trial court can enter a protective order restraining free expression, the court must find that three criteria exist: (1) The harm posed by dissemination must be substantial and serious. (2) The restraining order must be narrowly drawn and be precise. (3) There must be no alternative means of protecting the public interest which intrudes less directly on expression.
>
> In assessing the propriety of a protective order in each case, the trial court must consider and make necessary findings on each element of the standard.

*Kuiper*, 193 Mont. at 458-59, 632 P.2d at 698 (citing *Neb. Press*, 427 U.S. 539, 96 S. Ct. 2791; *In re Halkin*, 598 F.2d 176 (D.C. Cir. 1979)).

¶25 St. James argues that Dr. Cole's demonstrated course of conduct, combined with his direct threat to Dr. Chacko that "bad things can happen to you," shows that he was

engaging in harassing and intimidating speech not protected by the Constitution. St. James argues its position is supported by, among others, *State v. Nye*, 283 Mont. 505, 943 P.2d 96 (1997). Moreover, St. James asserts that Dr. Cole's reliance on *Nebraska Press* and *Kuiper* in this case is misplaced.

¶26 The First Amendment to the United States Constitution and Article II, Section 7 of the Montana Constitution both protect the right to free speech. The right to free speech is a fundamental personal right and "essential to the common quest for truth and the vitality of society as a whole." *Bose Corp. v. Consumer Union of United States, Inc.*, 466 U.S. 485, 503-04, 104 S. Ct. 1949, 1961 (1984). Of all the forms of infringement on the right to free speech prior restraints "are the most serious and least tolerable . . . ." *Nebraska Press*, 427 U.S. at 559, 96 S. Ct. at 2803. In fact, "the elimination of prior restraints on free speech was a 'leading purpose' in the adoption of the First Amendment." *Carroll v. Pres. and Commrs. of Princess Anne*, 393 U.S. 175, 181 n. 5, 89 S. Ct. 347, 351 n. 5 (1968) (quoting *Lovell v. City of Griffin*, 303 U.S. 444, 451-452 (1938)). The United States Supreme Court has defined prior restraints as follows:

> The term prior restraint is used to describe administrative and judicial orders *forbidding* certain communications when issued in advance of the time that such communications are to occur. Temporary restraining orders and permanent injunctions—*i.e.*, court orders that actually forbid speech activities—are classic examples of prior restraints.

*Alexander v. United States*, 509 U.S. 544, 550, 113 S. Ct. 2766, 2771 (1993) (quotation omitted).

¶27 However, not every injunction that amounts to a prior restraint is "impermissible." *Pittsburgh Press Co. v. Pittsburgh Commn. on Human Rel.*, 413 U.S. 376, 390, 93 S. Ct.

13

2553, 2561 (1973); *Nebraska Press*, 427 U.S. at 570, 96 S. Ct. at 2808 ("This Court has frequently denied that First Amendment rights are absolute and has consistently rejected the proposition that a prior restraint can never be employed."). "An injunction that is narrowly tailored, based upon a continuing course of repetitive speech, and granted only after a final adjudication on the merits that the speech is unprotected does not constitute an unlawful prior restraint." *Auburn Police Union v. Carpenter*, 8 F.3d 886, 903 (1st Cir. 1993) (citing *Pittsburgh Press Co.*, 413 U.S. at 390; *Securities & Exch. Commn. v. Wall St. Publ. Inst., Inc.*, 851 F.2d 365, 370 (D.C. Cir. 1988)); *accord Balboa Island Village Inn, Inc. v. Lemen*, 156 P.3d 339, 347 (Ca. 2007).

¶28    For instance, the United States Supreme Court has stated that it determines the constitutionality of content-neutral injunctions in the First Amendment area by considering whether they "burden no more speech than necessary to serve a significant government interest." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765, 114 S. Ct. 2516, 2525 (1994). This is in keeping with the First Amendment's repugnance to prior restraints and "the general rule, quite apart from First Amendment considerations, that injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Madsen*, 512 U.S. at 765, 114 S. Ct. at 2525 (quotation omitted). More recently, the Supreme Court has reiterated this view, stating that "a prior restraint should not swee[p] any more broadly than necessary" and that "[a]n order issued in the area of First Amendment rights must be precis[ely] and narrowly tailored to achieve the pin-pointed objective of the needs of the case." *Tory v. Cochran*,

14

544 U.S. 734, 738, 125 S. Ct. 2108, 2111 (2005) (quotations omitted, first alteration in original).

¶29     It is important to bear in mind that neither the First Amendment nor Article II, Section 7 provide unlimited protection for all forms of speech.  Some forms of speech and conduct are not considered constitutionally protected.

> "There are certain well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problems.  These include the lewd and obscene, the profane, the libelous, and the insulting or 'fighting' words—those which by their very utterance inflict injury or tend to incite an immediate breach of the peace.  It has been well observed that such utterances are no essential part of any exposition of ideas."  Furthermore, "free speech does not include the right to cause substantial emotional distress by harassment or intimidation."  Activities which are intended to embarrass, annoy or harass . . . are not protected by the First Amendment.

*Nye*, 283 Mont. at 512, 943 P.2d at 101 (quoting *State v. Cooney*, 271 Mont. 42, 48, 894 P.2d 303, 307 (1995) (other citations omitted)).

¶30     Before turning to an evaluation of the injunction before us, we deem it appropriate to address the applicability of the three-prong test from *Kuiper* to the instant case.  (See ¶ 24).   In *Kuiper* we applied a three-prong test from *In re Halkin* to determine the whether the terms of a protective order amounted to an unconstitutional prior restraint on free speech.  *Kuiper*, 193 Mont. at 456-59, 632 P.2d at 696-98; *In re Halkin*, 598 F.2d at 191.   While the *Kuiper* and *Halkin* approach *might* still be viable in the discovery context, *See Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 28-29, 104 S. Ct. 2199, 2205 (1984) (affirming a decision of the Washington State Supreme Court which conflicts with the holding of *In re Halkin*), there is nonetheless good reason to conclude that this approach should be limited to cases involving the intersection between discovery requests

15

in on-going litigation and the First Amendment. *See Seattle Times Co.*, 467 U.S. at 34, 104 S. Ct. at 2208 ("[O]ur consideration of . . . protective orders . . . takes into account the unique position that such orders occupy in relation to the First Amendment."). In fact, more recent pronouncements of both the United States Supreme Court, and other courts as well, have not relied upon the *In re Halkin* three-prong test when considering whether injunctions *outside* the context of the discovery process amount to unconstitutional prior restraints. *Madsen*, 512 U.S. at 765, 114 S. Ct. at 2525; *Tory*, 544 U.S. at 738, 125 S. Ct. at 2111; *Auburn Police Union*, 8 F.3d at 903; *Balboa Island*, 156 P.3d at 349.

¶31 Accordingly, rather than apply the three-prong test from *Kuiper* in this case, we will focus our inquiry on whether the injunction issued against Dr. Cole "sweep[s] any more broadly than necessary" and whether it is "precis[ely] and narrowly tailored to achieve the pin-pointed objective of the needs of the case." *Tory*, 544 U.S. at 738, 125 S. Ct. at 2111 (quotations and original alterations omitted).

¶32 After reviewing the terms of the injunction, we conclude that paragraph (d) is overly-broad and must be stricken. By its very terms, it does not prohibit conduct which is embarrassing, annoying or harassing, but enjoins Dr. Cole from "[i]ndicating to patients, potential patients or physicians, that Dr. Chacko, or the radiology services offered by St. James, are in any manner inadequate or unprofessional, either directly or indirectly . . . ." As noted by *Amici* Drs. Popovich, Sorini, Pullman, Chamberlin & Cortese and Southwest Montana Independent Healthcare Association, LLC, the terms of this injunction could enjoin Dr. Cole from giving professional opinions in the course of

providing radiology services. For instance, if Dr. Cole reviewed a radiology report from St. James which he believed contained inaccuracies or errors, he could be enjoined from expressing this opinion because it could be construed as a direct or indirect suggestion that the radiology services provided by St. James were not professional or adequate. As *Amici* point out, this could put Dr. Cole in a position that is unethical with regard to his duty to provide professional medical services to his patients. Thus, paragraph (d) sweeps too broadly, the District Court erred as a matter of law in issuing it, and it must be stricken.

¶33 Paragraph (e), as currently written, is overbroad as well. It enjoins Dr. Cole from "[c]alling, writing, or have contact of any kind, with any potential candidate for the radiology department at St. James, that would discourage or intimidate such candidate from negotiating or contracting with St. James, either directly or indirectly . . . ." As *Amici* point out, this injunction could prohibit Dr. Cole from giving truthful information concerning his opinion of St. James if a potential candidate were to contact him in order to solicit his views. As such, it could enjoin him from engaging in constitutionally protected free speech.

¶34 However, because portions of paragraph (e) do enjoin Dr. Cole from "intimidating" speech and conduct which is not constitutionally protected (see ¶ 29), this paragraph would be permissible if reformed as follows:

> Calling, writing, or having contact of any kind, with any potential candidate for the radiology department at St. James, that would ~~discourage or~~ intimidate such candidate from negotiating or contracting with St. James, either directly or indirectly . . . .

¶35 Thus, we conclude that paragraph (e), insofar as it enjoins "discouraging" conversation, is overbroad.

¶36 With respect to paragraph (a), we find that it is constitutionally permissible under the present circumstances and "precis[ely] and narrowly tailored to achieve the pin-pointed objectives of the needs of the case." *Tory*, 544 U.S. at 738, 125 S. Ct. at 2111 (quotations and original alteration omitted). However, if St. James does establish a working relationship with Boston University, and Dr. Cole continues to provide radiology services for St. James, it is conceivable that Dr. Cole might need to interact with members of Boston University in the course of providing radiology services. If the "needs of the case" change in this regard, then Dr. Cole could petition the District Court for an appropriate modification of the injunction.

¶37 Lastly, because paragraphs (b), (c), and (f) target only speech and conduct that is intended to embarrass, annoy, harass or threaten, such conduct may be enjoined and does not amount to an unconstitutional prior restraint on free speech. *See Balboa Island Village*, 156 P.3d at 347 (speech determined to be not constitutionally protected may enjoined); *Ansonia Associates Ltd. Partnership v. Ansonia Tenants' Coalition, Inc.*, 677 N.Y.S.2d 575, 576 (N.Y. App. Div. 1 1998) (holding that defendants may be enjoined from approaching, accosting, initiating communications with, or disturbing visitors to an apartment complex because such conduct is not constitutionally protected); *See also Bihari v. Gross*, 119 F. Supp. 2d 309, 327 (S.D.N.Y. 2000) (citing similar examples). Based on the "needs of the case," these paragraphs are all pin-pointed precisely toward

forms of speech and conduct which are not constitutionally protected; thus, these paragraphs may stand.

¶38    Our determination that paragraphs (a), (b), (c) and (f) are constitutional, that paragraph (e) must be reformed, and that paragraph (d) must be stricken, does not end our inquiry because Dr. Cole also argues that the injunction is infirm in aspects unrelated to whether its terms are unconstitutional as a matter of law.  Thus, we now evaluate these challenges to the injunction.

## B.  Sufficiency of the Evidence in Support of the Injunction

¶39    Dr. Cole argues there was insufficient evidence to support the finding that he engaged in threatening and harassing conduct, and that the District Court manifestly abused its discretion in issuing the injunction.  Dr. Cole claims that subsections (a), (b), and (c) of the injunction (¶ 17), were based solely on the phone call he allegedly had with Dr. Chacko (¶¶ 5-6), as well as the emails he exchanged with Dr. Chacko and other members of Boston University (¶¶ 4, 7), and that this evidence provided was an insufficient basis upon which to conclude that he was engaging in threatening conduct. Dr. Cole also asserts that with respect to (e), there was no evidence presented showing that he had engaged in the described conduct, other than the emails and phone call with Dr. Chacko.  Along these lines, he argues that the situation involving Dr. Alzheimer (¶¶ 10-15) is not relevant because he was never an actual candidate during the time that St. James was interviewing candidates for the exclusive radiology contract.  Finally, Dr. Cole maintains that subsection (f) of the injunction is not supported by the evidence

because "no one ever testified that Dr. Cole ever threatened any employee or agent of St. James verbally or physically."

¶40 We disagree with Dr. Cole and conclude that there was ample evidence supporting the finding that he was engaging in the type of harassing and threatening conduct described in the injunction. As an initial matter we note that while Dr. Cole has provided copies of the emails in this case, he has failed to provide us with a copy of the transcript of the injunction hearing on November 17, 2006. As a result, we will consider the findings of fact as promulgated by the District Court to be conclusive for purposes of appellate review. *Giambra v. Kelsey*, 2007 MT 158, ¶ 36, 338 Mont. 19, ¶ 36, 162 P.3d 134, ¶ 36.

¶41 With respect to paragraphs (a), (b), (c), (e) and (f) of the injunction, the District Court had the ominously-worded emails that Dr. Cole sent to Dr. Chacko and members of Boston University, as well as a direct threat which he made to Dr. Chacko on the telephone. (See ¶ 6). The unsolicited email to Dr. Chacko discussed the "things you should know about this situation," and noted that "essentially this is a predatory situation." Combined with the direct threat, there was sufficient evidence for the District Court to conclude that Dr. Cole was intimidating, threatening, and harassing Dr. Chacko.

¶42 Similarly, the unsolicited emails to members of Boston University referred to the "dark underbelly of practice," spoke of the "lengths to which hospital administrators will sink to get power over physicians," and expressed concerns that Boston University would also become a part of this course of conduct. Bizarrely, Dr. Cole also offered to provide "some information which is confidential, as it comes from our hospital radiology

20

department director . . . and I would not want to get her in trouble," and also threatened to investigate the legality of the Boston University's participation with St. James and SWMR. Contrary to Dr. Cole's assertions, these correspondences establish he was engaging in threatening, annoying, or intimidating speech against these individuals and organizations.

¶43 Additionally, the District Court heard testimony from individuals who stated they feared for their personal safety or were intimidated and harassed by Dr. Cole. Testimony from Dr. Alzheimer and Dr. Zurich was relevant because it demonstrated Dr. Cole had engaged in a repeated course of speech and conduct towards other employees and potential candidates for employment with St. James. The District Court determined this testimony was credible, and we have no basis to disturb these credibility findings on appeal. "It is for the trier of fact, and not this Court, to assess the credibility of witnesses and weigh the evidence; we will not second-guess a district court's determinations regarding the strength and weight of conflicting testimony." *Point Serv. Corp. v. Myers*, 2005 MT 322, ¶ 28, 329 Mont. 502, ¶ 28, 125 P.3d 1107, ¶ 28.

¶44 In issuing the injunction on the basis of this evidence the District Court acted reasonably and did not commit a manifest abuse of discretion which is "obvious, evident, or unmistakable." *Shammel*, ¶ 12. The fact that the District Court's findings of fact track closely the proposed findings from St. James does not alter our conclusion that the District Court did not err, based on the record before us.

**C. Standing**

21

¶45 Dr. Cole further maintains that paragraphs (b), (c), and (f) of the injunction are in violation of § 27-19-201(5), and Title 40, Chapter 15, MCA, because only St. James applied for the injunction, not the various parties who were protected by the injunction itself. As a result, Dr. Cole argues that neither Dr. Chacko, her supervisors, members of Boston University, nor the employees or agents of St. James were eligible for the type of injunctive relief provided by the District Court. We disagree.

¶46 Section 27-19-201, MCA, establishes the conditions under which an injunction may be granted. This statute reads as follows:

**27-19-201. When preliminary injunction may be granted.**

An injunction order may be granted in the following cases:

(1) when it appears that the applicant is entitled to the relief demanded and the relief or any part of the relief consists in restraining the commission or continuance of the act complained of, either for a limited period or perpetually;

(2) when it appears that the commission or continuance of some act during the litigation would produce a great or irreparable injury to the applicant;

(3) when it appears during the litigation that the adverse party is doing or threatens or is about to do or is procuring or suffering to be done some act in violation of the applicant's rights, respecting the subject of the action, and tending to render the judgment ineffectual;

(4) when it appears that the adverse party, during the pendency of the action, threatens or is about to remove or to dispose of the adverse party's property with intent to defraud the applicant, an injunction order may be granted to restrain the removal or disposition;

(5) when it appears that the applicant has applied for an order under the provisions of 40-4-121 or an order of protection under Title 40, chapter 15.

22

¶47 The subsections of this statute are disjunctive " 'meaning that findings that satisfy one subsection are sufficient.' Consequently, only one subsection need be met for an injunction to issue." *Sweet Grass Farms, Ltd. v. Bd. of Co. Commrs. of Sweet Grass Co.*, 2000 MT 147, ¶ 27, 300 Mont. 66, ¶ 27, 2 P.3d 825, ¶ 27 (quoting *Stark v. Borner*, 226 Mont. 356, 359, 735 P.2d 314, 317 (1987)).

¶48 Dr. Cole's argument mistakenly assumes that subsection (5) applies in this case. However, subsection (5), which references Title 40, Chapter 15, applies only to injunctions issued for the protection of victims of Partner and Family Member Assault, Sexual Assault and Stalking. This case, as St. James correctly points out, falls under subsections (1) and (2).

¶49 Here, the District Court found that without an injunction enjoining Dr. Cole from engaging in specified harassing and threatening speech and conduct towards individuals and organizations upon whom St. James relies for its continued success, St. James would suffer immediate and irreparable harm. The District Court further found that St. James had no other adequate remedy to protect itself, staff, employees, visitors, patients, and potential candidates for the radiology department, other than seeking an injunction. On the record before us, we conclude that St. James had standing to seek an injunction which would restrain Dr. Cole from engaging in harassing and intimidating conduct with respect to third parties with whom St. James engages in business, provides services, or retains in its employment. Additionally, we note that other courts have upheld the validity of these types of injunctions in similar contexts. See ¶ 37.

**D. Availability of Injunctive Relief**

¶50     Lastly, we address Dr. Cole's assertion that injunctive relief is not available in this case because when "harm can be remedied with an award of money it is not considered irreparable harm, and injunctive relief is not appropriate . . . ." Dr. Cole maintains that St. James' "exclusive remedy" for the alleged interference in this case is money damages, and that our holding *Van Loan v. Van Loan*, 271 Mont. 176, 895 P.2d 614 (1995) supports his position that an injunction is an inappropriate remedy.

¶51     St. James counters this argument by noting that if the negotiations between St. James and Boston University were to break down due to Dr. Cole's interference, an award of money would not be able to replace "the loss of this unique medical opportunity," or the lack of candidates that would be willing to negotiate with St. James, thus leading to a decrease in the quality of care for St. James' patients. St. James also notes that the District Court issued the injunction in part because of the threatening and harassing conduct directed at individuals such as Dr. Chacko, members of Boston University, and St. James' employees, and that monetary damages alone could not adequately compensate for these injuries. Additionally, St. James maintains that under *Rice v. C.I. Lanning*, 2004 MT 237, 322 Mont. 487, 97 P.3d 580, Montana law does not prohibit money damages and an injunction in the same case, and that *Van Loan* does not bar the issuance of the injunction against Dr. Cole.

¶52     We agree with the District Court that injunctive relief was an available remedy to St. James in this case. In the first instance, St. James correctly notes that "Montana law does not prohibit awarding money damages and an injunction in the same case." *Rice*, ¶ 29. In *Rice*, for instance, we upheld both the issuance of an injunction and money

24

damages, noting that the money damages were appropriate to compensate for a diminution in property value resulting from a defendant's conduct, while an injunction was appropriate to prevent the defendant from continuing a commercial operation which was prohibited under the restrictive covenants of a subdivision. *Rice*, ¶¶ 29-30. Whether or not money damages are also appropriate in this case in no way affects the propriety of the injunction itself. Thus, we conclude that injunctive relief was an appropriate remedy in this case.

## CONCLUSION

¶53 We conclude that the District Court erred as a matter of law in issuing paragraph (d) of the injunction, and that it must be stricken as an unconstitutional prior restraint on Dr. Cole's right to free speech. Similarly, we conclude that paragraph (e) of the injunction must be reformed in the manner described in ¶ 34 in order to be constitutionally permissible. With respect to paragraphs (a), (b), (c), (f), and the reformed version of paragraph (e), we conclude that there was sufficient evidence to support the injunction, St. James had standing to pursue it on behalf of Dr. Chacko, Boston University, its patients, employees, agents, and potential candidates at the radiology department, and that injunctive relief was an appropriate remedy in this case.

¶54 Accordingly, the District Court did not manifestly abuse its discretion in issuing paragraphs (a), (b), (c) and (f) of the injunction. However, we conclude the District Court did manifestly abuse its discretion in issuing paragraph (d) and a portion of paragraph (e), and thus remand this case for further proceedings consistent with this Opinion.

/S/ PATRICIA COTTER

We Concur:

/S/ JAMES C. NELSON
/S/ BRIAN MORRIS
/S/ W. WILLIAM LEAPHART
/S/ JOHN WARNER