**COURT OF CHANCERY**
**OF THE**
**STATE OF DELAWARE**

SAM GLASSCOCK III
VICE CHANCELLOR

COURT OF CHANCERY COURTHOUSE
34 THE CIRCLE
GEORGETOWN, DELAWARE 19947

Date Submitted: August 15, 2018
Date Decided: August 16, 2018

Thad J. Bracegirdle, Esquire
Julie M. O'Dell, Esquire
Wilks, Lukoff & Bracegirdle, LLC
4250 Lancaster Pike, Suite 200
Wilmington, Delaware 19805

Philip Trainer, Jr., Esquire
Randall J. Teti, Esquire
Ashby & Geddes
500 Delaware Avenue, 8th Floor
Wilmington, Delaware 19899

Re: *CapStack Nashville 3 LLC et al. v. MACC Venture Partners et al.*,
Civil Action No. 2018-0552-SG

Dear Counsel:

The road to a temporary restraining order ("TRO") is well-worn; it typically requires only that a movant show a non-frivolous claim of wrongdoing, and resulting threatened imminent irreparable harm, to trigger equity's solicitude. If a weighing of the equites then demonstrates that injunctive relief to maintain the status quo pending a final hearing is appropriate, Chancery will, typically, enter a TRO, limiting the freedom of action of the responding party.

Preventing harm is a public good, but it is not the only public good. In certain cases, other values trump maintenance of the status quo. In the Anglo-American judicial system, freedom of speech is a jealously guarded right. Historically, equity

denied itself jurisdiction over restraints on speech,[1] leaving determinations of the actionability of potentially slanderous speech to a jury of the speaker's peers at an action at law. Both the Delaware and Federal Constitutions have enshrined the right to speak, casting further doubt on the ability of Chancery to place prior restraints on speech, particularly before a determination of whether the speech is entitled to constitutional protection following a hearing on the merits.[2]

This TRO request illustrates this tension. Essentially, the movants contend that the respondents, the movants' business partners, have made false statements about the movants' conduct of the business, and threaten to make further such statements to investors and regulatory authorities, in an attempt to extort a business advantage. The respondents assert that the statements, and pending statements, are true. The movants' claims are colorable. For a number of reasons, however, I must decline to employ equity in prior restraint of the respondents' speech. I explain below.

---

[1] The interested reader is referred to Vice Chancellor Laster's scholarly and thoughtful examination of the development of the law in this area, in *Organovo Holdings, Inc. v. Dimitrov*, 162 A.3d 102 (Del. Ch. 2017).

[2] *See, e.g.*, *Hill v. Petrotech Res. Corp.*, 325 S.W.3d 302, 309 (Ky. 2010) (adopting "the modern rule that defamatory speech may be enjoined only after the trial court's final determination by a preponderance of the evidence that the speech at issue is, in fact, false, and only then upon the condition that the injunction be narrowly tailored to limit the prohibited speech to that which has been judicially determined to be false").

# I. BACKGROUND

The following facts are those alleged in the Complaint and in the Motion for a Temporary Restraining Order. This case stems from a joint venture to invest in and manage three apartment complexes in Nashville, Tennessee.[3] The joint venture has a rather baroque organizational structure. Nominal Defendant CSP Nashville 3 LLC ("CSP"), a Delaware limited liability company, is the entity that owns the properties.[4] Nominal Defendant CapStack MACC LLC ("CSM"), another Delaware limited liability company, serves as CSP's managing member.[5] CSM, for its part, has two 50% members: Plaintiff CapStack Nashville 3 LLC ("CapStack") and Defendant MACC Venture Partners LLC ("MACC").[6] Like CSP and CSM, CapStack and MACC are Delaware limited liability companies.[7] CSM has two managers: Plaintiff David Blatt (appointed by CapStack) and Defendant S. Anthony Azar (appointed by MACC).[8] The properties themselves are managed by Defendant Capstone Multifamily Group, LLC, a North Carolina limited liability company affiliated with Azar and MACC.[9]

---

[3] Compl. ¶ 1.
[4] *Id.* ¶ 5.
[5] *Id.* ¶ 6.
[6] *Id.* ¶ 7.
[7] *Id.*
[8] *Id.* ¶¶ 8–10.
[9] *Id.* ¶ 11.

The Plaintiffs purchased the apartment complexes in August 2017.[10]  Several months before the investment, the Plaintiffs had been introduced to the Defendants.[11] At that time, Azar told the Plaintiffs that he and the other Defendants had experience in managing apartment complexes, hiring appropriate staff, and negotiating with contractors.[12]  Based on these representations, the Plaintiffs decided in the fall of 2017 to offer the Defendants the opportunity to participate in a joint venture to manage the properties.[13]  The parties then executed an operating agreement and put in place the ownership structure described above.[14]

According to the Plaintiffs, it soon emerged that the Defendants' representations about their experience and capabilities were false.[15]  Although the Defendants claimed to have expertise in property management, they "severely overestimated the [p]roperties' capital expenditures budget."[16]  Worse, the Defendants allegedly breached several provisions of the operating agreement.[17]  For example, the Defendants violated the operating agreement's unanimity requirement by making important decisions for CSM and CSP without obtaining the Plaintiffs'

---

[10] *Id.* ¶ 13.
[11] *Id.*
[12] *Id.*
[13] *Id.* ¶ 14.
[14] *Id.*
[15] *Id.* ¶ 15.
[16] *Id.*
[17] *Id.* ¶¶ 17–19.

4

consent.[18]  The Defendants also breached the operating agreement by refusing to keep the Plaintiffs reasonably informed about developments at CSM and CSP.[19]

The Plaintiffs complained to the Defendants about this alleged misconduct. According to the Plaintiffs, the Defendants struck back, via a letter they sent on July 2, 2018, to counsel for Blatt and NH Cohen Capital LLC, the placement agent for the CSP investment.[20]  The letter accused *Blatt* of misconduct, including making several misrepresentations about his experience and qualifications in the CSP private placement memorandum ("PPM").[21]  For instance, according to the letter, the PPM falsely claimed that Blatt "was involved in turning around a list of multifamily developments, none of which appear to have been associated with Blatt, and several of which were actually demolished."[22]  The letter also asserted that the PPM misrepresented the fees Blatt received from the investment.[23]  Further, the letter quoted one of Blatt's former associates, who accused Blatt of "circulat[ing] an unofficial version of the PPM with markedly different terms, in an effort to defraud investors and others."[24]  The letter ended with a demand that Blatt and CapStack withdraw as a manager and member of CSM.[25]

---

[18] *Id.* ¶¶ 17–18.
[19] *Id.* ¶ 19.
[20] *Id.* ¶ 20.
[21] Compl. Ex. F.
[22] *Id.* at 1.
[23] *Id.*
[24] *Id.* at 2.
[25] *Id.* at 3.

The Plaintiffs rejected the demand.[26] Approximately two weeks later, the Defendants sent a second letter to counsel for Blatt and NH Cohen.[27] The Defendants reiterated their demand that the Plaintiffs withdraw from the joint venture.[28] The Defendants also stated that they intended to "notify investors of the facts and circumstances relating to the CSP . . . private placement memorandum and closing."[29] The Defendants then said, "We believe that investors, and the [Securities and Exchange Commission ("SEC")], would be most comfortable with the situation if David Blatt returned the funds taken at closing and he were no longer involved in the management of the investment."[30] The letter was sent on July 18, and it requested that Blatt take these steps by July 27.[31]

The Plaintiffs interpret the July 18 letter as threatening to disclose the allegations about Blatt to investors and the SEC unless the Plaintiffs withdrew from the joint venture.[32] According to the Plaintiffs, the statements about Blatt in the July letters are false.[33] In any event, as a result of the letters, Blatt resigned as a registered broker with NH Cohen on July 19.[34]

---

[26] Compl. ¶ 21.
[27] *Id.*
[28] Compl. Ex. G.
[29] *Id.* at 1.
[30] *Id.*
[31] *Id.*
[32] Compl. ¶ 21.
[33] *Id.* ¶¶ 20, 22, 64–68.
[34] *Id.* ¶ 22.

Instead of acceding to the Defendants' demands, the Plaintiffs commenced this action on July 27. Their Complaint asserts nine claims, including fraud, breach of contract, breach of fiduciary duty, tortious interference with contract, and defamation and/or trade libel.[35] The same day the Complaint was filed, the Plaintiffs moved for a TRO under Court of Chancery Rule 65(b). The Plaintiffs seek an order "temporarily enjoining Defendants and their respective partners, officers, agents, servants, employees, and those persons in active concert or participation with them, from making defamatory and libelous statements about Plaintiffs to the SEC, investors in CSP . . . , or any other third parties."[36] The Defendants oppose the request; I heard argument on the TRO on August 15.

## II. ANALYSIS

A TRO "may be issued when the movant demonstrates that: '[1] it has a colorable claim, [2] faces a likelihood of imminent, irreparable harm if relief is not granted, and [3] will suffer greater hardships if the TRO is not granted than the defendants would if the relief were granted.'"[37] "Of the three factors, irreparable harm is the most important; it is the *sine qua non* for this form of relief."[38] "The

---

[35] *Id.* ¶¶ 27–74.

[36] Pls.' Mot. for Temporary Restraining Order 9; *see also id.* at 5 ("By this motion, Plaintiffs seek an immediate injunction against Defendants' publication and dissemination of baseless, defamatory and libelous misstatements so that Plaintiffs' business reputation will  not be improperly harmed during the pendency of this action.").

[37] *CBS Corp. v. Nat'l Amusements, Inc.*, 2018 WL 2263385, at *3 (Del. Ch. May 17, 2018) (quoting *Arkema Inc. v. Dow Chem. Co.*, 2010 WL 2334386, at *1 (Del. Ch. May 25, 2010)).

[38] *IMO Daniel Kloiber Dynasty Trust*, 98 A.3d 924, 937 (Del. Ch. 2014).

purpose of a temporary restraining order is to preserve the *status quo* to enable the plaintiff to adequately . . . prepare his case and demonstrate his entitlement to ultimate relief."[39]

Here, the Plaintiffs seek a TRO enjoining the Defendants' speech. Specifically, the Plaintiffs ask this Court to temporarily enjoin the Defendants from making allegedly defamatory statements about the Plaintiffs to the SEC, investors in CSP, or any other third parties. In other words, the Plaintiffs seek a prior restraint.[40] That request must be denied for several reasons.

First, the Plaintiffs have failed to establish that irreparable harm will likely result absent a TRO. The filings in this case are a matter of public record; none of the parties' papers have been filed under seal. Indeed, the Plaintiffs themselves attached to the Complaint the letters that contain the purportedly defamatory material.[41] As a result, the allegedly false information the Defendants intend to convey to the SEC and other investors is already accessible to the public. It is unlikely, then, that further dissemination of this publicly available information would work irreparable harm on the Plaintiffs. Moreover, the Defendants

---

[39] *Dieleuterio v. Pennell*, 1985 WL 4567, at *2 (Del. Ch. Dec. 13, 1985).

[40] *See, e.g.*, *Alexander v. United States*, 509 U.S. 544, 550 (1993) ("Temporary restraining orders and permanent injunctions—*i.e.*, court orders that actually forbid speech activities—are classic examples of prior restraints."); *Auburn Police Union v. Carpenter*, 8 F.3d 886, 902 (1st Cir. 1993) ("Although the classic form of prior restraint involves an administrative licensing scheme, a judicial injunction that prohibits speech prior to a determination that the speech is unprotected also constitutes a prior restraint." (citation omitted)).

[41] Compl. Exs. F, G.

represented at oral argument that NH Cohen, which received the July letters, has already disclosed the supposedly defamatory allegations to the Financial Industry Regulatory Authority. The Defendants also represented that, as a result of this disclosure, the SEC already has or will initiate an investigation into the allegations. These developments cast further doubt on the efficacy of Plaintiffs' attempt to demonstrate that future speech threatens irreparable harm.

Second, the Plaintiffs' request runs afoul of the "traditional maxim that equity will not enjoin a libel."[42] This rule traces back to equity's traditional refusal "to exercise jurisdiction over a claim for defamation based on a prayer for injunctive relief."[43] The rule now rests on additional considerations, primarily "the importance afforded to the constitutional protections of speech."[44] Regardless of the rationale supporting the rule, "[t]he upshot is the same: a court of equity generally cannot issue an injunction in a defamation case."[45]

The principle that equity will not enjoin a libel has special force in the context of pretrial requests for injunctive relief. Some American jurisdictions "have endorsed permanently enjoining a defendant from repeating speech found defamatory in an adversarial proceeding."[46] Under this exception to the traditional

---

[42] *Organovo*, 162 A.3d at 115 (internal quotation marks omitted).
[43] *Id.*
[44] *Id.*
[45] *Id.* at 119.
[46] *Id.* at 124.

9

rule, "once a judge or jury has made a final determination that the speech at issue is defamatory, the speech determined to be false may be enjoined."[47] I need not decide whether this Court may enjoin speech that has been adjudged defamatory after a full trial on the merits.[48] Assuming such an injunction would be within the jurisdiction and power of equity, that is not the situation before me. Instead, the Plaintiffs ask me to temporarily enjoin future speech based solely on a finding that the Complaint pleads a *colorable claim* for defamation or trade libel. Colorability, in the TRO context, requires only that the claim not be frivolous; if a plaintiff pleads a non-frivolous claim of wrongful conduct and shows a threat of resulting imminent irreparable harm, a TRO may issue.[49] A finding that the plaintiff's claim is *likely* to prevail is not required. In my view, to enjoin speech upon such a showing would amount to an unconstitutional prior restraint.

When an injunction against speech is entered before a full trial on the merits, "it is almost always treated as an unconstitutional prior restraint."[50] The reason is

---

[47] *Hill*, 325 S.W.3d at 308.

[48] It appears that "no Delaware case has considered whether a court may enjoin future defamatory speech following an adjudication of falsity." *Organovo Holdings, Inc.*, 162 A.3d at 124 n.105.

[49] *CBS Corp.*, 2018 WL 2263385, at *3.

[50] Mark A. Lemley & Eugene Volokh, *Freedom of Speech and Injunctions in Intellectual Property Cases*, 48 Duke L.J. 147, 171 (1998); *see also Balboa Island Vill. Inn, Inc. v. Lemen*, 156 P.3d 339, 344–45 (Cal. 2007) ("[P]reventing a person from speaking or publishing something that, allegedly, would constitute a libel if spoken or published is far different from issuing a posttrial injunction *after* a statement that already has been uttered has been found to constitute defamation. Prohibiting a person from making a statement or publishing a writing *before* that statement is spoken or the writing is published is far different from prohibiting a defendant from *repeating* a statement or *republishing* a writing that has been determined at trial to be defamatory and, thus, unlawful. This distinction is hardly novel.").

10

straightforward: while such an injunction is in force, it "restrain[s] even speech that may ultimately prove to be protected."[51]  Likewise, "since preliminary injunctions are often easier to get than final determinations on the merits and are granted based on less evidence and less deliberation, the danger that the court will get it wrong and mistakenly restrict protected speech is even greater."[52]  Thus, "[i]n all but the most exceptional circumstances, an injunction restricting speech pending final resolution of constitutional concerns is impermissible."[53]  This rationale applies with equal force to First Amendment protections as well as the protections of speech and press found in the Delaware Constitution.[54]  Indeed, the Delaware Constitution appears to explicitly prohibit prior restraints, providing that "any citizen may print on any subject, being responsible for the abuse of that liberty."[55]

---

[51] *Freedom of Speech and Injunctions in Intellectual Property Cases*, *supra*, at 176.
[52] *Id.*
[53] *Bollea v. Gawker Media, LLC*, 2012 WL 5509624, at *1 (M.D. Fla. Nov. 12, 2012); *see also, e.g.*, *Alsworth v. Seybert*, 323 P.3d 47, 56 (Alaska 2014) ("Preliminary injunctions are almost always held to be unconstitutional burdens on speech because they involve restraints on speech before the speech has been fully adjudged to not be constitutionally protected.").
[54] Under the Delaware Constitution, "[t]he press shall be free to every citizen who undertakes to examine the official conduct of men acting in a public capacity; and any citizen may print on any subject, being responsible for the abuse of that liberty."  Del. Const. art. I, § 5.  The Delaware Supreme Court has held that "this provision has the same scope as the federal first amendment." *Gannett Co., Inc. v. State*, 571 A.2d 735, 740 n.9 (Del. 1989).
[55] Del. Const. art. I, § 5; *cf. Gulf States Theatres of Louisiana, Inc. v. Richardson*, 287 So. 2d 480, 491 (La. 1973) ("Louisiana Constitution, Article I, Section 3 reads: 'No law shall ever be passed to curtail or restrain the liberty of speech or of the press; Any person may speak, write and publish his sentiments on all subjects, being responsible for the abuse of that liberty.' This is a clear and concise statement of our constitutional view that there can be no prior restraint of speech or other expression. One may speak, but when he exercises this privilege, he is accountable if there is an actual abuse of the privilege under one of the few exceptions to total freedom of expression."); *William Goldman Theatres, Inc. v. Dana*, 173 A.2d 59, 61 (Pa. 1961) ("Apart from the Fourteenth Amendment, the guarantee of free communication of thought and opinion is independently

11

Here, it is unclear whether the speech the Defendants propose to engage in is constitutionally unprotected defamation. At oral argument, the Defendants vigorously disputed the Plaintiffs' contention that their threat, or promise, to speak was intended as coercive or retaliatory, or their words false. The record in this case is sparse, and neither side has taken any discovery. Again, the standard for evaluating the Plaintiffs' claims at this stage—colorability—is exceedingly easy to satisfy; it requires only that a plaintiff state "a non-frivolous cause of action."[56] Thus, it may turn out that, contrary to the allegations in the Complaint, the accusations against Blatt are true, and that the Defendants did not use those accusations to extort concessions from the Plaintiffs.[57] In that case, a TRO enjoining the Defendants from repeating the allegations about Blatt to other parties would have the effect of forbidding the Defendants from engaging in constitutionally protected

---

protected by our State Constitution of 1874. Article I, Section 7, P.S., thereof recognizes and declares that 'The free communication of thoughts and opinions is one of the invaluable rights of man, and every citizen may freely speak, write and print on any subject, being responsible for the abuse of that liberty.' This provision is a direct inhibition on previous restraint of an exercise of the protected rights . . . ." (emphasis omitted)).

[56] *Newell Rubbermaid Inc. v. Storm*, 2014 WL 1266827, at *9 (Del. Ch. Mar. 27, 2014) (internal quotation marks omitted).

[57] *Cf. Freedom of Speech and Injunctions in Intellectual Property Cases*, *supra*, at 201 ("When even a low probability of success on the merits can yield a preliminary injunction, we should expect that in many cases even speech that would ultimately be found protected will be preliminarily enjoined. If a court concludes, for instance, that a plaintiff should get a preliminary injunction even though he has only a 33% chance of success on the merits (perhaps because the balance of hardships favors him), this in effect represents a judgment that it is better that two constitutionally protected works be temporarily enjoined than one copyright infringement remain unenjoined. Perhaps this is a sound judgment as a matter of pure copyright law (though even there one might question the wisdom of the tradeoff), but it is particularly troubling from a First Amendment perspective." (footnote omitted)).

speech. The rule against speech restraints prior to a merits determination is designed to address precisely this situation.[58] Accordingly, even if the Plaintiffs could state a colorable claim for defamation and demonstrate a likelihood of imminent, irreparable harm, they would not be entitled to the TRO they seek.

The Plaintiffs try to avoid this conclusion by characterizing their defamation claim as one for "trade libel," and then suggesting that the Complaint also states a claim for tortious interference with business relations. According to the Plaintiffs, a TRO is appropriate in such a circumstance under *J.C. Pitman & Sons v. Pitman*, a case decided by this Court over seventy years ago.[59] There, Chancellor Harrington held that "a continued course of wrongful action may, ordinarily, be stopped by injunction, although it includes a trade libel."[60] Under *Pitman* and similar cases from other jurisdictions, an injunction may be granted where "the trade libel furthered another tort that independently warranted equitable relief."[61] I note that *Pitman* does not deal specifically with interim as opposed to final injunctive relief—the case was before the Chancellor on a general demurrer, the equivalent of a motion to dismiss the complaint.[62]

---

[58] *See Latino Officers Ass'n, New York, Inc. v. City of New York*, 196 F.3d 458, 465 (2d Cir. 1999) ("The danger of a prior restraint, as opposed to *ex post* disciplinary action, is precisely that making predictions *ex ante* as to what restrictions on speech will ultimately be found permissible is hazardous and may chill protected speech.").

[59] 47 A.2d 721 (Del. Ch. 1946).

[60] *Id.* at 726.

[61] *Organovo Holdings, Inc.*, 162 A.3d at 120.

[62] *Pitman*, 47 A.2d at 200.

In my view, *Pitman* does not support the Plaintiffs' request for injunctive relief. *Pitman* does not define the tort of trade libel, but this Court has since had occasion to describe the doctrine's historical evolution. The concept of trade libel "initially covered statements 'disparaging the quality . . . of property,' then expanded 'to encompass any injury to economic advantage arising from false derogatory statements.'"[63] The Second Restatement embodies this expanded view of trade libel, classifying it as a subset of the tort of "injurious falsehood."[64] The Restatement defines injurious falsehood as follows:

> One who publishes a false statement harmful to the interests of another is subject to liability for pecuniary loss resulting to the other if
>
> (a) he intends for publication of the statement to result in harm to interests of the other having a pecuniary value, or either recognizes or should recognize that it is likely to do so, and
>
> (b) he knows that the statement is false or acts in reckless disregard of its truth or falsity.[65]

"The purpose of an injurious falsehood claim . . . is to protect economic interests of the injured party against pecuniary loss as opposed to [t]he purpose of a defamation claim[,] which is to protect reputation."[66]

---

[63] *Organovo Holdings, Inc.*, 162 A.3d at 120 (quoting Michael A. Albert & Robert L. Bocchino, Jr., *Trade Libel: Theory and Practice Under the Common Law, the Lanham Act, and the First Amendment*, 89 Trademark Rep. 826, 827 (1999)).

[64] *See Incyte Corp. v. Flexus Biosciences, Inc.*, 2017 WL 7803923, at *7 (Del. Super. Nov. 1, 2017) ("The Restatement explains that trade libel is a type of injurious falsehood, a tort that is recognized by Delaware courts.").

[65] Restatement (Second) of Torts § 623A (Am. Law Inst. 1971).

[66] *DeNoble v. DuPont Merck Pharm. Co.*, 1997 WL 35410094, at *5 (Del. Super. Apr. 11, 1997).

In other words, as traditionally understood, trade libel addressed false statements about a competitor's products—statements of a kind that could damage or destroy a competitor in ways not readily remediable by *ex post facto* damages.[67] Some jurisdictions, concerned that free speech could be used as a bludgeon to destroy competition without effective redress at law, were receptive to the idea that such malicious business falsehoods were subject to injunctive restraint, particularly when the statements invoked another tort doctrine as well.[68] Here, the Plaintiffs' trade-libel claim is not of the traditional variety; it does not involve disparagement of goods. Instead, the Plaintiffs allege that the Defendants have falsely accused Blatt of lying in an offering memorandum, thereby harming the Plaintiffs' pecuniary interests. In my view, these allegations are insufficient to overcome the longstanding rule forbidding pretrial injunctions against speech. Indeed, that rule would lose much of its vitality if the Plaintiffs' argument were accepted.

Assuming that she is gainfully employed, it should not be difficult for the typical defamation plaintiff to allege that purportedly false speech injured her pecuniary interests. Presumably, a false accusation that such a plaintiff is a liar would hurt her earning capacity. And even if that could not be proved at trial, a court considering a TRO would likely be forced to accept as true a plaintiff's

---

[67] *Organovo Holdings, Inc.*, 162 A.3d at 120.
[68] *Id.*

allegation that defamatory statements about her integrity harmed her ability to pursue economic activity. Thus, by characterizing a defamation claim as one for trade libel (and including in her complaint a separate tort, perhaps for intentional infliction of emotional distress), a plaintiff could circumvent the well-established prohibition on prior restraints. The exception would come nigh to swallowing the rule. Such an outcome could chill protected speech.[69]

Accordingly, assuming Delaware law, following *Pitman*, permitted issuance of a TRO to prevent a *traditional* trade libel accompanied by an independent tort supporting equitable relief—as the Plaintiffs urge me to find—such is not the situation here. Rather, the Plaintiffs in this case seek to exploit the expanded scope of trade libel to overcome the rule against pretrial speech restraints. Because the Plaintiffs' request for a TRO risks restraining speech before this Court determines whether it is constitutionally protected, the application must be denied.[70]

---

[69] *See Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations*, 413 U.S. 376, 390 (1973) ("The special vice of a prior restraint is that communication will be suppressed, either directly or by inducing excessive caution in the speaker, before an adequate determination that it is unprotected by the First Amendment.").

[70] Moreover, it is not clear whether the Plaintiffs have stated even a colorable claim for tortious inference with business relations. To state a claim for tortious interference, the plaintiff must allege, among other things, "the reasonable probability of a business opportunity." *DeBonaventura v. Nationwide Mut. Ins. Co.*, 419 A.2d 942, 947 (Del. Ch. 1980). "[T]o plead a reasonable probability of a business opportunity, [a plaintiff] must identify a specific party who was prepared to entered into a business relationship but was dissuaded from doing so by the defendant and cannot rely on generalized allegations of harm." *Agilent Techs., Inc. v. Kirkland*, 2009 WL 119865, at *7 (Del. Ch. Jan. 20, 2009) (internal quotations marks omitted). The Complaint fails to identify any specific party that planned on doing business with the Plaintiffs but was discouraged from doing so by the Defendants. Thus, even accepting the Plaintiffs' argument

Finally, I note an additional consideration. At oral argument, it appeared that a primary concern of the Plaintiffs is to prevent the Defendants from making the purportedly defamatory allegations *to the SEC*. Although I need not decide the question here, I assume that the Defendants are at least conditionally privileged to reveal these allegations to the SEC. Like other administrative agencies, the SEC performs quasi-judicial functions.[71] The Complaint suggests that the Defendants seek to have the SEC investigate the allegations about Blatt, and perhaps initiate proceedings against him. Under the Second Restatement, "[a] witness is absolutely privileged to publish defamatory matter concerning another in communications preliminary to a proposed judicial proceeding or as a part of a judicial proceeding in which he is testifying, if it has some relation to the proceeding."[72] By contrast, many jurisdictions, perhaps including this one,[73] have held that such communications receive only a qualified privilege.[74] In any event, the possibility that the statements

---

that injurious falsehood plus a separate tort can support a TRO against future speech, the Plaintiffs have arguably failed to allege facts supporting such a separate tort.

[71] *See, e.g.*, *Lucia v. SEC*, 138 S. Ct. 2044, 2049 (2018) ("The SEC has statutory authority to enforce the nation's securities laws. One way it can do so is by instituting an administrative proceeding against an alleged wrongdoer. By law, the Commission may itself preside over such a proceeding. But the Commission also may, and typically does, delegate that task to an ALJ. . . . [A]n SEC ALJ exercises authority 'comparable to' that of a federal district judge conducting a bench trial.").

[72] Restatement (Second) of Torts § 588 (Am. Law Inst. 1971).

[73] *See Matthews v. Mancuso*, 2017 WL 4164419, at *3 (Del. Super. Sept. 19, 2017) (holding that allegedly defamatory statements to the New Castle County Housing Authority were qualifiedly privileged).

[74] *See* David Elder, *Defamation: A Lawyer's Guide* § 2:10 (2018) ("A large number of cases involve persons making formal or informal complaints to prosecutors or law enforcement officers.

17

the Defendants wish to make to the SEC are privileged[75] weighs against entry of the TRO.

For the reasons above, the Plaintiffs' request that I enter a temporary restraining order is DENIED.  To the extent the foregoing requires an Order to take effect, IT IS SO ORDERED.

Sincerely,

*/s/ Sam Glasscock III*

Sam Glasscock III

---

Although considerable disagreement exists, the overwhelming majority view provides only a qualified privilege." (footnotes and internal quotation marks omitted)).

[75] The Plaintiffs contended at oral argument that such a privilege may only run to *the victim* of the alleged wrongdoing, a proposition that, to my mind, is not supported by public policy, logic, or law.